[No. S042287. Aug. 28, 1995.]

JAMES R. WALLER, JR., et al., Plaintiffs and Respondents, v. TRUCK INSURANCE EXCHANGE, INC., et al., Defendants and Appellants.

4

**COUNSEL**

Waldman & Chuang, Carter & Chuang, Craig H. Bell, Horvitz & Levy, Ellis J. Horvitz, David M. Axelrad and Mitchell C. Tilner for Defendants and Appellants.

Charles W. Savage, Jody Carr, Michael A. Mathews, Buchalter, Nemer, Fields & Younger, Roxani M. Gillespie, Richard de Saint Phalle, J. Karren Baker, Barbara G. Mikalson, Haight, Brown & Bonesteel, Roy G. Weatherup, Maureen Haight Gee, Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Thomas Holden, Robie & Matthai, James R. Robie, Michael J. O'Neill, Pamela E. Dunn, Chapman, Popik & White, Susan M. Popik, Kathleen M. Wardlaw, McCormick, Bartsow, Sheppard, Wayte & Carruth, James P. Wagoner, James H. Wilkins, Wendy S. Lloyd, Gregory A. Floyd, Ropers, Majeski, Kohn & Bentley, Mark G. Bonino, Lawrence O. Monin

and Allison G. Dobbrow as Amici Curiae on behalf of Defendants and Appellants.

Ford & Pedersen, The Ford Law Firm, William H. Ford III, Claudia J. Serviss, Neil Pedersen, George G. Kim, Michael D. Collins, Paul C. Cook, Osborn & Patton, Osborn, Anderson & Wood, Richard G. Osborn, George F. Robertie, Carol F. Anderson and Susan E. Abitanta for Plaintiffs and Respondents.

James T. Linford, Irell & Manella, Thomas W. Johnson, Jr., Steven L. Sloca, Marc S. Maister, Mary-Christine Sungaila, Hill, Wynne, Troop & Meisinger, Kirk A. Pasich, Lori Yankelevits, Thomas & Elliott, Steve Thomas, Jay Elliott, Brobeck, Phleger & Harrison, David M. Halbreich, Latham & Watkins, G. Andrew Lundberg, Paul, Hastings, Janofsky & Walker, Ronald M. Oster, Eve M. Coddon, Heller, Ehrman, White & McAuliffe, David B. Goodwin, Wayne S. Bravemen, Munger, Tolles & Olson and Charles D. Siegal as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**LUCAS, C. J.**—We granted review to decide the recurring issue whether a commercial general liability insurer is required to defend a third party action that seeks incidental emotional distress damages caused by the insured's noncovered economic or business torts. The Court of Appeal below concluded that allegations of incidental emotional distress damages flowing from noncovered causes of action fall outside the scope of a commercial (formerly called comprehensive) general liability (CGL) policy and present no potential for coverage under the policy. Accordingly, the Court of Appeal reasoned, because there is no potential for coverage, there is no duty to defend on the part of the insurer. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] [hereafter *Gray*].) The Court of Appeal also concluded that if the insurer is under no obligation to defend or indemnify the third party action, it cannot be found liable for either statutory bad faith (Ins. Code, § 790.03) or breach of the implied covenant of good faith and fair dealing, for its denial of a defense. (See, e.g., *Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1152 [271 Cal.Rptr. 246] [bad faith claim cannot be maintained unless policy benefits are due].) As we explain, we affirm the Court of Appeal judgment.

### FACTS

In 1985, defendant Truck Insurance Exchange, Inc. (hereafter T.I.E.) issued a CGL policy to plaintiff Marmac, Inc., a California corporation that

provides engineering and design services to aerospace, pharmaceutical, and energy industries. The declarations page of the T.I.E. policy identified Marmac as the named insured, and contained an endorsement naming Lester Amey, among others, as a named insured. The policy was renewed in 1986, and was substantially identical (with typographical corrections) to the 1985 policy.

In pertinent part, the T.I.E. policy provided liability coverage for: "all damages which the insured becomes legally obligated to pay because of . . . bodily injury to any person, and . . . damage to property . . . to which this insurance applies, caused by an occurrence." The policy did not provide personal injury coverage to Marmac directors and officers and specifically excluded coverage for any insured for bodily injury to a named insured. The policy defined an "occurrence" "as an event, or series of events, including injurious exposure to conditions, proximately caused by an act or omission of the insured regardless of the number of persons, vehicles or objects affected by the act or omission which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." Defendant Farmers Insurance Exchange (Farmers), as T.I.E.'s adjuster, was responsible for handling claims filed by T.I.E. insureds.

Prior to August 29, 1986, plaintiff Waller, Marmac's president, owned 60 percent of Marmac stock. Amey, Marmac's executive vice-president, owned 40 percent. On August 29, 1986, Waller sold his stock in equal proportions to employees Hendrix, Akers, Petersen, and Hepple. Thereafter, Waller resigned from Marmac's board, and Hendrix and Hepple were elected to the board, with Amey remaining as the third member. Akers subsequently became president of the company, and Hendrix, Hepple and Petersen became vice-presidents. Amey was thereafter demoted.

Amey sued Marmac, Waller, and the four Marmac officers under 11 causes of action: involuntary dissolution (Corp. Code, § 1800, subd. (b)(4) & (5)); breach of fiduciary duty; breach of statutory duty of good faith (*id.*, § 309); interference with prospective economic advantage; breach of contract; breach of the implied covenant of good faith and fair dealing; breach of duty of good faith and fair dealing; inducing breach of contract; conspiracy; intentional infliction of emotional distress; and injunctive relief. The first amended complaint included allegations that Marmac's board of directors was "guilty of or have knowingly countenanced acts of persistent and pervasive fraud, mismanagement or abuse of authority and persistent unfairness toward Amey," and that they excluded "Amey from any voice in the management [of Marmac]" to deprive him of a controlling block of stock in

the corporation and in order to "gain a controlling interest in and to freeze Amey, a minority shareholder, out of the corporation." Amey also accused the management of Marmac of "self-dealing in voting themselves substantial increases in salary, and causing [Marmac] to enter into an unreasonable or sham contract of employment with [Waller]."

Amey also accused Waller of disregarding and breaching his fiduciary duties to Amey, failing "to exercise good faith and due care so as to avoid unfairness to [Amey] by entering into a transaction to dispose of his dominant or control block of stock in [Marmac] without the slightest regard to the wishes and interests, and without prior knowledge of [Amey], and for the purpose of gaining an unfair advantage in the sale or transfer of said controlling block of shares."

Amey's 10th cause of action alleged intentional infliction of emotional distress against Waller and the Marmac officers, and claimed that because of their conduct, Amey "suffered humiliation, mental anguish, and emotional and physical distress." Amey alleged that as fiduciaries, Waller and the Marmac officers' conduct leading up to the involuntary dissolution and wrongful termination as alleged in the complaint "was outrageous, went beyond all reasonable bounds of decency, was intentional and malicious and was done for the purpose of causing [Amey] to suffer humiliation, mental anguish, and emotional and physical distress." In making these allegations, Amey did not include Marmac as a named defendant, but nonetheless incorporated all allegations of corporate misconduct and financial detriment into the cause of action.

One week after the Amey suit was filed, Robert Kull, Marmac's corporate attorney, wrote T.I.E. at its home office requesting the insurer defend the Amey lawsuit on behalf of all defendants. About three weeks latter, the letter was forwarded to Farmers' regional liability claims manager in Santa Ana. The claims manager sought an in-house coverage opinion, but did not act on the defense question. That issue was forwarded to Farmers' Anaheim branch claims office. Richard Neisser, manager of the Anaheim office, tentatively concluded that the complaint alleged a noncovered business dispute. He discussed the matter with William Vaughter, a claims representative, and instructed Vaughter to investigate the loss and to verify whether the Amey complaint had been served. Vaughter told Hendrix around December 10 or 11, 1986, that he was going to process the claim for payment. According to Hendrix, Vaughter then asked whether he was pleased with his counsel because Farmers could provide counsel if he was not.

On December 29, 1986, the insureds forwarded to Vaughter the total billing (in the amount of $54,000) for attorney fees incurred in defending

the Amey lawsuit. Neisser directed Vaughter to (1) "transmit to [in house counsel] after you have called and discussed, among other things, whether the insurer owes a defense and whether there is an obligation under [*San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358, 364 (208 Cal.Rptr. 494)], (2) send a reservation of rights letter and (3) make up an office file." Neisser concluded, based on the allegations of the complaint, that the policy did not provide coverage for Amey's claims. Neisser then instructed Vaughter to contact in-house counsel, who advised Vaughter to deny the claim. Neisser prepared an evaluation recommending "no coverage."

The regional claims manager (Eastman) concurred in Neisser's decision that the CGL policy did not provide coverage under the allegations of the Amey complaint. Eastman based his decision on the following factors: (1) Amey's complaint did not state an occurrence within the policy insuring clause because Amey was not claiming bodily injury or property damage, and any economic injuries he suffered were expected or intended from the standpoint of the insureds; (2) the policy endorsement listed Amey as a named insured and the policy expressly excluded coverage for liability to named insureds; and (3) Amey was a Marmac employee, and the policy excluded coverage for bodily injury suffered by Marmac employees arising out of and in the course of employment. Eastman testified that the amount of attorney fees already incurred did not influence his decision to recommend a denial of coverage under the policy.

In January 1987, Eastman directed Neisser: "Please deny the insureds' request with an appropriate response outlining specifically that since no coverage is available under the policy contract, nothing can be considered as far as any payment is concerned." Neisser sent the insureds the following denial letter:

"We have received your claim for attorney fees in the Lester H. Amey v. Marmac [case]. Accordingly, we have reviewed your policy in its entirety, spoken to your agent, obtained the opinion of our house counsel and submitted the entire packet of information to our Regional Office for a decision regarding whether this loss is covered under your policy.

"The claim against Marmac is essentially a shareholder dispute regarding intentional acts committed by Marmac and their principles [*sic*]. Intentional Acts are not covered under your Sentinel business policy or any endorsements taken out by Marmac. Accordingly we are unable to make payment for legal expenses incurred by Marmac in this matter."

Marmac's counsel asked for reconsideration of the denial, asserting that Amey's amended complaint created a potential for coverage under the CGL

policy. The request was forwarded to the regional office, and the office confirmed the "no coverage" decision. Thereafter, Waller, Marmac, and the Marmac officers successfully defended the Amey action.

Between May and August of 1987, Waller, Marmac, and the four individual defendants filed separate lawsuits against T.I.E. and Farmers, alleging causes of action for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, deceit, and negligent misrepresentation. All plaintiffs sought both compensatory and punitive damages. Waller amended his pleading to substitute Farmers, Farmers Group, Inc., and Truck Underwriters Association for several Does. (Waller later dismissed the latter two entities from his complaint.) Marmac and the other plaintiffs amended their pleadings to substitute Farmers as a party. Two years later the three actions were consolidated and the parties filed second amended complaints, the subject of this proceeding. Only Waller's second amended complaint alleged a cause of action for statutory bad faith pursuant to Insurance Code section 790.03. Marmac, Hendrix, Akers, Petersen, and Hepple amended their complaints to include a section 790.03 cause of action following the close of evidence at trial.

After the trial court denied a joint motion for judgment on the pleadings filed by T.I.E. and Farmers, the parties tried the legal issues to the court. (Code Civ. Proc., § 592.) The court ruled that (1) Amey's first amended complaint "alleges facts potentially within bodily injury coverage" of the T.I.E. policy; (2) as a matter of law, "the occurrence clause in [the policy] gives rise to a duty to defend in this case"; (3) T.I.E.'s letter to Marmac denying coverage "waived policy based defenses not specified therein"; and (4) Insurance Code section 533, disallowing coverage for the insured's "willful" acts, did not excuse T.I.E. from its duty to defend under the policy. The trial court concluded: "[T]he logical conclusions of all the findings made so far, [is that] as a matter of law you had a duty to defend."

Following plaintiffs' opening statements in the jury trial, the trial court granted motions for nonsuit filed by T.I.E. and Farmers on the following causes of action: breach of fiduciary duty, fraud, deceit and negligent misrepresentation, as well as claims by Marmac and Hendrix, Petersen, Akers, and Hepple regarding allegations that T.I.E.'s failure to defend the Amey lawsuit prejudiced their defense.

The trial court granted plaintiffs' motions for partial directed verdict that T.I.E. breached the implied covenant of good faith and fair dealing, and that Farmers was jointly and severally liable with T.I.E. for the breach.

After concluding that both T.I.E. and Farmers violated Insurance Code section 790.03, the jury returned verdicts in favor of plaintiffs in the

following approximate amounts: to Hendrix, Akers, Petersen, and Hepple, the jury awarded $89,000 for the cost of defending the Amey lawsuit. Marmac received contract damages in the amount of $349,000 and attorney fees in the amount of $390,000. (See *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] [allowing attorney fees for tortious breach of insurance contract].) The jury awarded Waller contract damages of $144,000, attorney fees of $334,000, lost consulting fees of $227,500 and emotional distress damages of $250,000.

After originally being deadlocked on the punitive damages issue, the jury returned a nine-to-three verdict in favor of such damages. It awarded Waller $27 million in punitive damages against Farmers, and $3 million in punitive damages against T.I.E. Marmac received punitive damages totaling $26 million, and Hendrix, Akers, Petersen, and Hepple received a total of $4 million in punitive damages.

On motions for new trial filed by T.I.E. and Farmers, the court ordered the judgment corrected to eliminate Farmers' liability for policy benefits. The court also ruled that the punitive damages awarded to Hendrix, Akers, Petersen, and Hepple were excessive.

Both T.I.E. and Farmers appealed and the Court of Appeal reversed the entire judgment after concluding that T.I.E.'s CGL policy did not provide coverage under the allegations of the Amey complaint. The Court of Appeal concluded that because Amey's alleged emotional and physical distress flowed from noncovered economic loss, there was no potential for coverage and hence no duty to defend the plaintiffs against the Amey lawsuit. The Court of Appeal summarized its holding as follows: "Clearly, the Amey lawsuit sets forth nothing more than a business dispute; the torts alleged in the suit are all business and contract transgressions. Simply put, the gravamen of the Amey lawsuit is economic loss. In our view, the damages claim for emotional and physical distress is clearly derivative of and caused by the economic loss suffered by Amey."

We conclude the Court of Appeal correctly analyzed the duty to defend and coverage issues under authority from our state and federal courts. Moreover, the finding of no duty to defend in this context is consistent with the reasonable expectations of the parties when they enter into a contract for commercial general liability insurance, for it is widely understood by both insureds and insurers that such policies are not intended to cover economic losses. As we explain, the damages alleged in Amey's complaint flowed from intangible property losses that could not be considered covered occurrences under the CGL policy. Likewise, the derivative emotional distress

damages sought by Amey for the plaintiffs' alleged business torts were not covered because they flowed from the same noncovered acts. Any damages flowing from noncovered losses that may lead to emotional distress cannot be used to expand coverage where none was intended or bargained for by the parties. (*Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154, 156-157 [hereafter *Keating*]; *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1150-1151 [29 Cal.Rptr.2d 559] [hereafter *McLaughlin*].) We begin our analysis with an explanation of a third party CGL policy and its intended coverage.

## DISCUSSION

### A. *The Commercial General Liability Policy*

■ In pertinent part, a CGL policy, often referred to as a business general liability policy, provides liability insurance for businesses. The policy is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause. (*Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802 [26 Cal.Rptr.2d 391].) Before "even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms]." (*Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1017 [247 Cal.Rptr. 638].) "This is significant for two reasons. First, '. . . when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded.' (*Glavinich* v. *Commonwealth Land Title Ins. Co.* (1984) 163 Cal.App.3d 263, 270 [209 Cal.Rptr. 266].)

"Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage." (*Collin* v. *American Empire Ins. Co.*, *supra*, 21 Cal.App.4th at p. 803.) Accordingly, the insured has the burden of showing that there has been an "occurrence" within the terms of the policy. (*Ibid.*)

■ The CGL policy restricts coverage to damages "caused by an occurrence," which, in standard pre-1986 policies, was defined as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Although more recent policies (including T.I.E.'s policy) have replaced the term "accident" with "event" (to include gradual events within the concept of accident), the phrase "neither expected nor intended" focuses coverage on *unexpected* or *accidental injuries* that are

fortuitous and not planned or intended. This concept of fortuity is basic to insurance law. (*Chu* v. *Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86, 94-95 [274 Cal.Rptr. 20] (*Chu*).) Insurance typically is designed to protect against contingent or unknown risks of harm (Ins. Code, §§ 22, 250), not to protect against harm that is certain or expected. (*Chu, supra*, 224 Cal.App.3d at pp. 94-95.) In other words, such insurance generally protects against risks of loss rather than certainties of loss. (*Ibid.*; see e.g., *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 747 [15 Cal.Rptr.2d 815] [the phrase "expected or intended" precludes coverage for damage that the insured subjectively intended to be a result of its conduct, as well as damage that it in fact subjectively foresaw as practically certain to be a result of its conduct].)

■ Standard CGL policies define bodily injury to mean: "bodily injury, sickness or disease [including death at any time resulting therefrom] sustained by any person." (3 Keller & Golub, Cal. Insurance Law & Practice (1995) ch. 49, General Liability Policies, § 49.14[1], pp. 49-27 to 49-28.)

The property loss section of the standard policy provides coverage for "physical injury or destruction of tangible property which occurs during the policy term." The focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws or nonperformance of contractual obligations. (See, e.g., *Gulf Ins. Co.* v. *L.A. Effects Group, Inc.* (9th Cir. 1987) 827 F.2d 574, 578 [no coverage under business general liability policy for insured's alleged non-performance of contractual obligations to create special visual effects for motion picture]; *Lassen Canyon Nursery* v. *Royal Ins. Co. of America* (9th Cir. 1983) 720 F.2d 1016, 1018 [business liability policy for property damage does not cover claims for strictly economic losses caused by insured's alleged antitrust violations]; *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 303 [24 Cal.Rptr.2d 467, 861 P.2d 1153] [recognizing that "a suit seeking recovery for injuries to intangible economic interests is not a suit 'of the nature and kind' covered by a CGL policy"]; *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318] [hereafter *Chatton*] [ruling there was no coverage for emotional distress damages resulting from investment losses caused by negligent misrepresentation]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 217 [169 Cal.Rptr. 278] [hereafter *Giddings*] [no coverage for intangible economic interests, including breach of securities laws and fraud].) As *Giddings* observed, "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. [Citations.] A complaint seeking to recover damages of this nature from an insured falls within

the scope of the insurance coverage only where these intangible economic losses provide 'a measure of damages to physical property which is within the policy's coverage.' [Citations]." (*Id.* at p. 219.)

Finally, by statute, and as a matter of public policy, the insurer may not provide coverage for willful injuries by the insured against a third party. (Ins. Code, § 533.)

*The Interpretation of Insurance Contracts*

■ When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law. (*AIU Ins. Co* v. *Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253] [hereafter *AIU*].) The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. (Civ. Code, § 1638; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764] [hereafter *Reserve Insurance*].) Thus, in determining whether allegations in a particular complaint give rise to coverage under a CGL policy, courts must consider both the occurrence language in the policy, and the endorsements broadening coverage, if any, included in the policy terms. (*Collin* v. *American Empire Ins. Co.*, *supra*, 21 Cal.App.4th at p. 803.) `

The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)" (*AIU*, *supra*, 51 Cal.3d at pp. 821-822; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] [hereafter *Bank of the West*].) A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. (*Bay Cities Paving Grading, Inc.* v. *Lawyers' Mutual Insurance Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. (*Bank of the West*, *supra*, 2 Cal.4th at p. 1265.) Courts will not

strain to create an ambiguity where none exists. (*Reserve Insurance, supra,* 30 Cal.3d at p. 807.)

These well-established precepts of insurance coverage guide us in our determination of whether a particular policy requires a liability insurer to defend a lawsuit filed by a third party against the insured. ■ It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. (*Gray, supra,* 65 Cal.2d at p. 276; see also *Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 295.) This duty, which applies even to claims that are "groundless, false, or fraudulent," is separate from and broader than the insurer's duty to indemnify. (*Gray, supra,* 65 Cal.2d at pp. 273-275.) However, " 'where there is no possibility of coverage, there is no duty to defend . . . .' " (*Fire Ins. Exchange* v. *Abbott* (1988) 204 Cal.App.3d 1012, 1029 [251 Cal.Rptr. 620].) *Gray* and its progeny have made it clear that the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. (*Gray, supra,* 65 Cal.2d at p. 276; *La Jolla Beach & Tennis Club Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 44 [36 Cal.Rptr.2d 100, 884 P.2d 1048] [test is whether underlying action for which defense is sought potentially seeks relief within policy terms].)

Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. (*Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493]; *State Farm Mut. Auto. Ins. Co.* v. *Flynt* (1973) 17 Cal.App.3d 538, 548-549 [95 Cal.Rptr. 296].) This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy. (*Gray, supra,* 65 Cal.2d at p. 274; *Giddings, supra,* 112 Cal.App.3d at p. 218.) With these principles in mind, we proceed with our discussion of T.I.E.'s duties to plaintiffs under its CGL policy.

B. *T.I.E.'s Duty to Defend*

■ The T.I.E. CGL policy insuring language was standard. The company agreed to "pay all damages which the insured becomes legally obligated to pay because of . . . bodily injury to any person, and . . . damage to property . . . to which this insurance applies, caused by an occurrence." Bodily injury was defined as "sickness or disease" and property damage

meant "physical injury or destruction of tangible property." The T.I.E. policy also contained the standard exclusions for "bodily injury to any employee of the insured arising out of and in the course of his employment by the insured," and for "the liability of any insured for bodily injury to . . . the named insured."

The policy defined "occurrence" to mean "an event, or series of events, including injurious exposure to conditions, proximately caused by an act or omission of the insured regardless of the number of persons, vehicles or objects affected by the act or omission which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." Thus, to demonstrate a potential for coverage under T.I.E.'s policy, an insured must show the claim he must defend is an alleged act or omission that caused bodily injury or tangible property damage (as defined by the policy) to the third party, and that the alleged injury was neither expected nor intended by the insured.

The first issue we address is whether, under the insuring language and definitions of the liability policy, T.I.E. owed a duty to defend plaintiffs against Amey's lawsuit based on the fact that T.I.E.'s CGL policy provided coverage for "property damage" and "bodily injury" caused by an "occurrence."

In reversing the trial court judgment, the Court of Appeal focused on the fact that Amey's complaint alleged emotional and physical distress flowing from an uncovered economic loss. The appellate court found no duty to defend the underlying lawsuit because the "gravamen" of the complaint was economic loss. It found the damages for emotional and physical distress were derivative of and inseparable from Amey's allegations of intentional and business torts, allegations that could not, by themselves, give rise to coverage under a CGL policy.[1]

The Court of Appeal relied principally on three cases (including two cases decided after the trial in the present matter) to conclude that T.I.E. had no duty to defend the Amey action because plaintiffs' alleged misconduct (as asserted in the Amey complaint) was not potentially covered by the T.I.E. policy. (*Keating, supra,* 995 F.2d at pp. 156-157; *McLaughlin, supra,* 23 Cal.App.4th at pp. 1150-1151; *Chatton, supra,* 10 Cal.App.4th 846.)

In *Keating, supra,* the United States Court of Appeals for the Ninth Circuit addressed the issue whether, under California law, an insurer had a duty to

---

[1]Because the Court of Appeal believed that CGL policies were never intended to cover conduct that causes economic losses, it did not address (except for brief reference in a footnote) either the "named insured" or "employee liability" exclusions that may have provided additional grounds for denying a duty to defend the Amey action. We find it unnecessary to address alternative grounds for denying a duty to defend in this case.

defend its insureds against an investor action alleging that the insureds' conduct in committing securities fraud and other related claims had caused the plaintiff investors to suffer economic damages that, in turn, resulted in their suffering from " 'emotional and physical distress, and impairment of health.' " (995 F.2d at p. 156.) The court held the insurer owed no duty to defend the underlying investor lawsuits because the alleged emotional and physical distress flowed from economic losses, which were not covered by the CGL policy and therefore did not give rise to a duty to defend. (*Ibid.*)

The *Keating* court relied on *Allstate Ins. Co. v. Interbank Financial Services* (1989) 215 Cal.App.3d 825 [264 Cal.Rptr. 25] (hereafter *Allstate*), which denied coverage under a CGL policy for bodily injury in a lawsuit alleging that an investment firm had conspired to convince third party plaintiffs to make unsound investments. In reaching its conclusion, the *Allstate* court held that "[t]he [liability] policy covers losses resulting from accidental events which cause bodily injury or property damage, not the giving of professional or investment advice. . . . Here, although the insureds attempt to characterize the claims differently, the clear bases of the complaints are that the insureds gave poor professional advice and the plaintiffs lost money in a tax shelter investment. [¶] Had these insureds desired to obtain a professional liability policy to protect them from charges resulting from the performance of professional services, such insurance could have been obtained [at a higher premium]. . . . [J]ust as an insurer would not reasonably expect that a [CGL] policy would cover claims for securities fraud, these insureds could not reasonably expect that such claims would be covered under this policy." (*Id.* at pp. 830-831.)

As in *Allstate, supra*, 215 Cal.App.3d at pages 830-831, the *Keating* court recognized that economic or business loss "of the sort alleged by the investors" is not a covered loss within the meaning of a standard CGL policy. Nor, in the *Keating* court's view, is emotional and physical distress induced by (or derivative of) the economic loss a covered event. As the court observed, "It would expand coverage of these policies far beyond any reasonable expectation of the parties to sweep within their potential coverage any alleged emotional or physical distress that might result from economic loss that is itself clearly outside the scope of the policy." (*Keating, supra*, 995 F.2d at p.156.) For this latter statement, the *Keating* court relied on *Chatton, supra*, 10 Cal.App.4th 846, a coverage case that is nonetheless applicable to our duty to defend discussion because the court concluded that a CGL policy does not provide a potential for coverage for allegations based on economic losses and emotional distress flowing from those losses. (*Id.* at p. 857.)

In *Chatton*, several investors sued the directors and officers of Technical Equities, an investment services company, for fraud, negligent misrepresen-

tation, breach of fiduciary duty and negligence. The investors prevailed on their negligence and fraud causes of action and were awarded damages for both their economic losses and resulting emotional distress, as well as punitive damages. Following their success at trial, the investors filed a declaratory relief action against the company's liability insurer to adjudicate coverage. The trial court held, among other things, that there was coverage under the bodily injury clause because the investors' emotional distress constituted "bodily injury" under the CGL policy, and that the wrongful activities of Technical Equities (i.e., security manipulations, note fraud, etc.) were "occurrences" within the meaning of the same policy.

The Court of Appeal reversed, holding that any emotional distress suffered by the investors due to their economic losses was not covered by the liability policy even though those losses were caused by the negligent misrepresentations of Technical Equities officers and directors. (See *Warner v. Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029 [281 Cal.Rptr. 635]; *Allstate, supra,* 215 Cal.App.3d 825; *Giddings, supra,* 112 Cal.App.3d 213; *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 279 [142 Cal.Rptr. 681].) This is so, the court held, because the "bodily injury" clause under a CGL policy "provides coverage for bodily injury to the person and for physical injury to, or destruction or loss of use of, *tangible property.*" (*Chatton, supra,* 10 Cal.App.4th at p. 857, some italics omitted.) Recognizing that the investors' emotional distress claims were "predicated upon the 'bodily injury' clause of the CGL policy," the court concluded that the emotional trauma suffered by the investors was caused by investment or *intangible* economic losses which, in turn, were caused by the negligent misrepresentations of the Technical Equities officers. (*Id.* at p. 860.) The emotional trauma, the court concluded, fell outside the coverage clauses of the CGL policy. (*Id.* at p. 858.)

The present Court of Appeal also relied on *McLaughlin, supra,* 23 Cal.App.4th 1132, 1150, another case involving Technical Equities officers and directors, decided after the *Keating* and *Chatton* cases. One issue in *McLaughlin* was whether the insurer had a duty to defend against an action alleging that the insureds' conduct had caused the investor plaintiffs to suffer economic damages and resultant mental, physical and emotional distress. (*Ibid.*) The *McLaughlin* court followed the reasoning of *Keating, supra,* 995 F.2d 154, and *Chatton, supra,* 10 Cal.App.4th 846, to reverse a multimillion-dollar, bad faith judgment against Technical Equities's insurer, National Union Fire Insurance Company of Pittsburgh, Pa., and to conclude the insurer owed no duty to defend under the bodily injury and property damage clauses because none of the damages sought was allowed under the CGL policy.

The *McLaughlin* court observed, "[p]laintiffs' physical and emotional distress derived from their investment loss which in turn was negligently inflicted upon them by the insureds. First, the property damage coverage under the CGL extends only to physical injury to, or destruction or loss of use of, 'tangible property.' Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to *intangible* property which by definition fall outside the scope of the [CGL] policy. (*Chatton, supra,* 10 Cal.App.4th at pp. 857-858.) [¶] Second, since [p]laintiffs' physical distress was induced by an uncovered economic loss it defies reason that bodily injury coverage would nevertheless independently obtain." (*McLaughlin, supra,* 23 Cal.App.4th at p. 1150, italics in original.)

We agree with the Court of Appeal below that *Keating, Chatton,* and *McLaughlin* properly determined that CGL policies do not provide coverage for economic losses that cause emotional distress. As we have observed, the CGL policy provides coverage for "occurrences" that cause bodily injury or tangible property losses. (*Giddings, supra,* 112 Cal.App.3d at p. 217.) These policies were never intended to cover emotional distress damages that flow from an uncovered "occurrence," and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress is alleged as a result of the economic loss. (*Keating, supra,* 995 F.2d at p. 157, fn.1.) Accordingly, when we apply this rule to the present case and look to the allegations of the Amey complaint compared with the terms of T.I.E.'s CGL policy, we conclude that T.I.E. owed no duty to defend the Amey lawsuit. (*Gray, supra,* 65 Cal.2d at p. 276.) All allegations in the Amey complaint were related to Amey's asserted *economic loss* as a Marmac shareholder, and, as T.I.E. noted in its denial letter, shareholder disputes are not covered by its policy. In sum, the allegations of the Amey complaint, liberally construed, did not assert a risk potentially covered under T.I.E.'s CGL policy. Nonetheless, plaintiffs make several procedural arguments urging this court to recognize a duty to defend based on the allegations of the complaint.

First, plaintiffs contend that T.I.E. and Farmers should not be allowed to rely on either *Keating* or *McLaughlin*, or their theory of no coverage for economic losses, because those cases were not decided until after the trial in the present matter was complete. Moreover, plaintiffs contend the "economic loss" issue cannot be considered because it was not raised in the trial court or in the regular briefing in the Court of Appeal.

Both arguments fail. As T.I.E. and Farmers observe, Courts of Appeal routinely consider newly published case law that was not available until after entry of judgment in the trial court. (See, e.g., *Hattersley* v. *American*

*Nucleonics Corp.* (1992) 3 Cal.App.4th 397, 402 [4 Cal.Rptr.2d 331] [rejecting claim that appellant should be foreclosed from relying on theory of law espoused in newly decided Court of Appeal opinion]; see also Cal. Rules of Court, rule 29.3(a) ["When a party desires to present new authorities . . . not available in time to have been included in the party's brief on the merits, the party may serve and file a supplemental brief . . . ."].)

Moreover, after the *Keating* and *McLaughlin* cases were decided, T.I.E. (and Farmers) sought, and obtained permission, to file supplemental briefs. As the Court of Appeal observed, supplemental briefing is proper when a court wishes to consider a point of law following the regular briefing of a case on appeal. (See *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 423-424, fn. 1 [71 Cal.Rptr. 903, 445 P.2d 519]; *Kievlan* v. *Dahlberg Electronics, Inc.* (1978) 78 Cal.App.3d 951, 957, fn. 5 [144 Cal.Rptr. 585].)

Second, as T.I.E., Farmers, and the Court of Appeal observe, the duty to defend issue involves a question of law based on undisputed facts. Under settled law, the Court of Appeal had discretion to address the issue even though it had not been raised in the trial court. (*Canaan* v. *Abelnour* (1985) 40 Cal.3d 703, 733, fn. 17 [221 Cal.Rptr. 468, 710 P.2d 268, 69 A.L.R.4th 915]; see *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534] [new theory pertaining to question of law on facts appearing in the record may be raised for the first time on appeal].)

In a related context, plaintiffs assert the Court of Appeal should not have applied *Keating* or *McLaughlin* "retroactively" because both cases represent new law that should not be used to justify T.I.E.'s denial of a defense to the Amey action. Plaintiffs also claim that any uncertainty on legal questions of policy interpretation compels a defense of a third party lawsuit until the issue is resolved by controlling authority.

These claims ignore the general rule that judicial decisions are to be applied retroactively. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-982 [258 Cal.Rptr. 592, 772 P.2d 1059] ["general rule that judicial decisions are given retroactive effect is basic to our legal tradition"]; *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585] [relying on general rule of retroactive application of judicial decisions]; see also *Harper* v. *Virginia Dept. of Taxation* (1993) 509 U.S. 86, 96 [125 L.Ed.2d 74, 86, 113 S.Ct. 2510, 2517] (hereafter *Harper*) [stating that in general, civil decisions "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"].)

Notwithstanding the general rule on retroactive application of case law, plaintiffs assert that neither *Keating* nor *McLaughlin* should apply to their

bad faith action because they relied on pre-*Keating* law "in deciding what facts needed to be explored in the Amey suit." Plaintiffs also assert that *Keating* was an unforseeable decision, and retroactive application of its holding would be contrary to the public policy behind the duty to defend.

Similar arguments were rejected by the high court in *Harper, supra,* 509 U.S. at p. 96 [125 L.Ed.2d at p. 86, 113 S.Ct. at p. 2517]. The *Harper* court found unmeritorious the argument that a court should consider the equities of each individual case in deciding the question of retroactivity. (Cf. *Newman* v. *Emerson Radio Corp., supra,* 48 Cal.3d at pp. 986-987.) Moreover, the Ninth Circuit's decision in *Keating* was not new law; rather it was a clarification of the law as it existed when plaintiffs tendered their defense to T.I.E. Thus, T.I.E. may rely on *Keating* to defend the position it took at the time of tender, and its position here, that there was no possibility of coverage under the facts alleged or otherwise known to T.I.E. Indeed, the *Keating* decision was but a logical extension of the principle, well established at the time T.I.E. denied a defense in the Amey action (see e.g., *Lassen Canyon Nursery, supra,* 720 F.2d 1016, 1018; *Giddings, supra,* 112 Cal.App.3d 213, 219; *Fresno Economy Import Used Cars, Inc., supra,* 76 Cal.App.3d 272, 279), that a CGL policy does not cover intangible economic loss. (*Keating, supra,* 995 F.2d at p. 156.)

 Plaintiffs' related claim, that the lack of authority on the duty to defend issue required a defense by T.I.E. of the Amey lawsuit because "uncertainty of policy interpretation compels a duty to defend in this case," is equally unmeritorious. Plaintiffs misinterpret *CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 605 [222 Cal.Rptr. 276] (hereafter *CNA Casualty*) (criticized on other grounds in *Montrose* v. *Superior Court, supra,* 6 Cal.4th at pp. 297, 298). *CNA Casualty* held that: "An insurer's duty to defend must be analyzed and determined on the basis of any *potential* liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense." (176 Cal.App.3d at p. 605, italics in original.) As the Court of Appeal below observed, *CNA Casualty* simply recites the settled rule that the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage under the policy and a corresponding duty to defend. *CNA Casualty* does not hold, as plaintiffs suggest, that the insurer must always defend a third party lawsuit absent a published judicial opinion definitively construing the specific policy provision on which the insurer relies, or, as plaintiffs assert, "until the extent of 'the policy coverage' is legally certain," to deny the defense. This has never been the law. (See, e.g., *McLaughlin, supra,* 23 Cal.App.4th at p. 1152 [duty to defend depends on facts in complaint; where only potential for liability

turns on resolution of legal question, there is no duty to defend]; citing *State Farm Mut. Auto. Ins. Co.* v. *Longden* (1987) 197 Cal.App.3d 226, 233 [242 Cal.Rptr. 726].)

As plaintiffs themselves observe, the determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. (*Gray, supra,* 65 Cal.2d at p. 276.) If the terms of the policy provide no potential for coverage, as in this case, the insurer acts properly in denying a defense even if that duty is later evaluated under case law that did not exist at the time of the defense tender. (*Ibid.;* see *Giddings, supra,* 112 Cal.App.3d 213; see also *Coit Drapery Cleaners, Inc.* v. *Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1608-1609 [18 Cal.Rptr.2d 692] [affirming summary judgment for insurer based on numerous cases decided after insurer refused to defend]; *Standard Fire Ins. Co.* v. *Peoples Church of Fresno* (9th Cir. 1993) 985 F.2d 446, 448-451 [applying *Bank of the West, supra,* 2 Cal.4th 1254, to relieve insurers of obligation to defend action pending when *Bank of the West* was decided].)

Here, the terms of the policy provided coverage for an "occurrence," meaning an event proximately caused by the insured's act or omission that causes either bodily injury or tangible property damage neither expected nor intended from the standpoint of the insured. The event in this case that led to Amey's complaint was the purposeful conduct of Waller and Marmac in allegedly mismanaging Marmac property, manipulating the value of Marmac stock, disregarding Amey's rights as a minority shareholder, violating the corporate bylaws, interfering with Amey's prospective economic advantage and inducing Waller to breach his stock-sale contract with Amey. This conduct, according to plaintiffs eventually resulted in financial detriment to Amey and was the reason he suffered "humiliation, mental anguish, and emotional and physical distress." Thus, the alleged policy "occurrence" under which T.I.E. evaluated coverage was based entirely on economic acts or events that resulted in economic injury and mental and physical damages to Amey. At no point did Amey allege an "occurrence" that could have triggered liability and thus a duty to defend, i.e., an event based on a noneconomic act causing either emotional distress or bodily injury.

Plaintiffs claim that the "plain meaning of the words [in the insuring clause] would lead the insured to reasonably expect the insurer to defend him against suits seeking damages for bodily injuries caused by an occurrence as defined." This argument is misleading, for it ignores the fact that the occurrence or act leading to coverage must be an injury to tangible property, not to one's economic interest. It is well established that CGL

policies do not provide coverage for intangible property losses, including economic losses. (*Chatton, supra*, 10 Cal.App.4th 846, 850; *Giddings, supra*, 112 Cal.App.3d 213.) Both *Keating* and *McLaughlin* apply the *Chatton* and *Giddings* rule, notwithstanding the fact that the insureds in those cases alleged both mental and physical distress caused by the economic occurrence. Because the alleged "occurrence" here was the creation of economic loss to Amey, harmful enough to result in his removal from the company, there is no potential for coverage and no corresponding duty to defend under the policy, regardless of the damages allegedly suffered by Amey as a result of that loss.

Plaintiffs next criticize *Chatton* (and, indirectly, *Keating* and *McLaughlin*) for creating an "economic loss" exclusion by allegedly confusing the definitions of "bodily injury" and "property damage" as they appeared in the CGL policy. This "economic loss exclusion," plaintiffs claim, "is an unwarranted expansion and attenuation of the holding in *Giddings* v. *Industrial Indemnity Co., supra*, 112 Cal.App.3d 213," which simply held that purely economic losses do not constitute tangible property losses under a CGL policy. (*Giddings, supra*, 112 Cal.App.3d at pp. 218-219.)

Plaintiffs claim that *Chatton* created an "economic loss" exclusion by erroneously eliminating the separate and independent nature of "bodily injury" coverage and "property damage" coverage in a CGL policy. They argue that *Chatton* would require covered property damage as a prerequisite to bodily injury and thereby eviscerate the separate and independent coverage for bodily injury resulting from an occurrence, and criticize *Chatton*'s reliance on cases defining "tangible property loss." (See, e.g., *Allstate, supra*, 215 Cal.App.3d 825, 830 [economic or contractual losses not tangible property losses in CGL policy]; *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 67 [248 Cal.Rptr. 217] [emotional distress damages not recoverable as element of fraud].)

We agree with the Court of Appeal that plaintiffs' criticism of the *Chatton* analysis is unwarranted. As the Court of Appeal observed, when the third party complaint alleges emotional and/or physical distress flowing from economic losses—as was the case in *Chatton, Keating,* and *McLaughlin* as well as in the present lawsuit—the occurrence or event that causes damages is an economic loss. There is no separate "bodily injury" occurrence within the terms of the policy. Thus, the injured party's claim that he suffered incidental emotional distress flows directly from the economic occurrence and, hence, is not covered by the CGL policy.

As the Court of Appeal also noted, the result reached by the courts in *Chatton, Keating,* and *McLaughlin* is consistent with the reasonable expectations of the parties when they enter into an insurance contract for CGL

coverage. It is simply not within the intent of parties to a CGL contract that the "bodily injury" provision would require the insurer to defend a third party lawsuit in which uncovered economic loss is the gravamen of the complaint.

Plaintiffs also attempt to distinguish this case from *Chatton, Keating,* and *McLaughlin* on the ground that the definition of "occurrence" in the T.I.E. policy is different from the standard definition found in the policies governing the above cases. In the T.I.E. policy, the word "accident" is absent from the definition of "occurrence," and there is no modifying language for "event or series of events" in the occurrence clause. Plaintiffs claim this indicates that the volitional nature of the occurrence or event leading to coverage is irrelevant, and the T.I.E. policy therefore potentially covers intentional or purposeful acts. Plaintiffs rely on *United Pacific Ins. Co.* v. *McGuire Co.* (1991) 229 Cal.App.3d 1560, 1564 [281 Cal.Rptr. 375] (hereafter *United Pacific*) to support their contention.

The issue in *United Pacific, supra,* 229 Cal.App.3d at page 1563, was whether a plaintiff's claim of wrongful termination that allegedly resulted in mental distress was an "event" within the meaning of a policy endorsement that defined "occurrence" to mean " 'an accident, an event or a continuous or repeated exposure to conditions which results, during the policy period, in bodily injury or property damage neither expected nor intended by the insured.' " (Italics omitted.) The *United Pacific* court held that the expanded policy "definition of occurrence provides coverage for intentional actions (subject to the statutory limitations of Ins. Code, § 533) that result in bodily injury but excludes coverage for those elements of *damages* that were expected or intended by the insured." (*United Pacific, supra,* 229 Cal.App.3d at p. 1566, italics added.) Thus, the defendants were covered for the intentional act of terminating the plaintiff, as long as the result of the termination —i.e., emotional distress—was not intended by the defendants. (*Ibid.*)

Plaintiffs assert that *United Pacific* supports their argument for a duty to defend in cases involving intentional economic torts that lead to emotional distress. The argument is misplaced. First, in contrast to the present case, the *United Pacific* court did not question whether coverage for "bodily injury" includes incidental emotional distress damages that may flow from a non-covered loss. In addition, as the Court of Appeal below observed, the issue we address does not focus on whether plaintiffs' actions toward Amey were intentional; thus, this difference in the policy language is irrelevant.

Finally, plaintiffs assert that the Court of Appeal disregarded the rule set forth by this court in *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th

1076 [17 Cal.Rptr.2d 210, 846 P.2d 792] (hereafter *Horace Mann*). There, a student sued her teacher primarily for sexual misconduct, but included allegations of negligence in her complaint. The defendant's general liability policy provided for coverage " 'as a result of any claim arising out of an occurrence in the course of the insured's educational employment activities, and caused by any acts or omissions of the insured . . . .' " (*Id.* at pp. 1079-1080.) A majority of this court held that the insurer must provide a defense under the complaint of any claim potentially covered, even though the noncovered claims predominated the action: "Horace Mann contends that [defendant's] alleged misconduct apart from the molestation could not possibly give rise to liability because the admitted molestation is the 'dominant factor' in this case. The argument misconceives the role of the court in determining the duty to defend. We look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy. [Citation.] Since an insurer has a duty to defend the entire third party action if any claim encompassed within it potentially may be covered . . . the mere fact that Horace Mann could not indemnify [defendant] for the molestation did not eliminate its duty to defend other, possibly covered claims." (*Id.* at p. 1084, italics in original.)

Plaintiffs are correct that the complaint for sexual misconduct in *Horace Mann, supra*, 4 Cal.4th at pages 1079-1080, alleged potentially covered negligent acts. By contrast, the Amey complaint alleged no potentially covered acts because all allegations were based on the occurrence of business torts, corporate mismanagement and other equally noncovered acts. Moreover, rather than predominate, the noncovered acts in this case comprised the entire complaint. Thus, the facts on which Amey based his theory of intentional infliction of emotional distress were identical business and contract transgressions on which he based the remainder of his complaint. Unlike the complaint in *Horace Mann, supra*, 4 Cal.4th 1076, therefore, the Amey complaint gave rise to no potential for coverage under T.I.E.'s CGL policy, and hence no duty to defend. (*Gray, supra*, 65 Cal.2d at p. 276.)

Plaintiffs also argue that in addition to the alleged emotional and physical distress, the Amey complaint asserted loss in reputation and humiliation that did not arise from the occurrence of economic loss and should give rise to a duty to defend under *Horace Mann, supra*, 4 Cal.4th 1076. This claim is equally unavailing. Plaintiffs assert that Amey's complaint arguably alleged conduct resulting in uncovered "bodily injury" as well as potentially covered conduct. For example, plaintiffs claim that although Amey's allegations of physical distress were generally alleged to have been caused by all of the acts set forth in the complaint, his bodily injury allegations were not specific as to "root causes." Plaintiffs note that Amey's allegations were broad and

varied and alleged that plaintiffs' conduct in changing Amey's job description humiliated him in front of others. In addition, Amey alleged he was upset and distressed by being excluded from the board and shareholder meetings and the decisionmaking process. Amey was also upset that despite his implicit trust in Waller for over 16 years, Marmac's officers entered into a secret stock transaction causing Amey fear, anger, and a sense of betrayal. Indeed, plaintiffs observe, Amey was distressed because he felt he was being forced out of Marmac, a company he felt he owned and which he helped build. Plaintiffs contend that for T.I.E., Farmers, "and the Court of Appeal to claim that, as a matter of law on undisputed facts, all such allegations necessarily or entirely flowed from economic loss, is, respectfully, incomprehensible."

As T.I.E., Farmers, and the Court of Appeal observe, however, any lost reputation and humiliation Amey may have suffered was, like the emotional and physical distress alleged in the Amey complaint, directly related to the uncovered business torts and economic loss. That plaintiffs' alleged business torts may have caused Amey to feel betrayed, angry or distressed, does not transform those feelings into a separate occurrence under the bodily injury clause of the CGL policy.

## C. *Waiver and Estoppel*

The trial court ruled that, as a matter of law, T.I.E.'s denial letter of January 16, 1987, "waived policy based defenses not specified therein." On appeal, T.I.E. challenged the trial court's ruling, but the Court of Appeal declined to reach the issue after concluding there was no potential of coverage under the policy. Plaintiffs now assert that even if *Chatton, Keating,* and *McLaughlin* correctly preclude coverage for emotional distress damages arising from an economic occurrence, T.I.E. nonetheless should have been required to provide a defense to the Amey action on the ground that a liability insurer that refuses to defend a suit on a specified ground impliedly waives all other nonspecified grounds it knew or would have discovered by a reasonable investigation.

In their opening briefs, plaintiffs assert that in addition to waiver of defenses based on T.I.E.'s denial letter, T.I.E.'s "conduct over the past seven years, particularly the failure to raise the *'Keating'* issue in its denial letter and subsequent failure to raise the issue during litigation, evidences an objective intent to waive its right to rely on the issue." We address the waiver issue notwithstanding the Court of Appeal's refusal to do so, and despite the fact that it was not actually pleaded by plaintiffs at the trial court level, because it was a basis for the trial court's findings and is an important

recurring issue that requires our attention. We conclude that an insurer does not impliedly waive coverage defenses it fails to mention when it denies the claim.

### 1. *Waiver*

As noted above, T.I.E. denied a defense to the Amey action because it believed the CGL policy provided no potential for coverage for what its claims managers believed was essentially a "shareholder dispute" giving rise to uncovered "intentional acts." Plaintiffs assert that because T.I.E.'s denial letter failed to state specifically that the policy did not cover "economic losses," T.I.E. waived its right to rely on *Keating* and its progeny in denying a duty to defend. In essence, we are asked to consider whether the doctrine of waiver may be invoked to create coverage for losses that the CGL policy by its terms did not cover. We address this issue, notwithstanding the antiwaiver clause in T.I.E.'s policy. That clause states the insurer does not waive rights or terms under the policy in the absence of an endorsement and focuses on the terms and conditions of the policy itself, rather than on the insurer's claims practices. In sum, the clause does not affect the insured's right to assert waiver of defenses in a denial letter.

Case law is clear that " '[w]aiver is the intentional relinquishment of a known right after knowledge of the facts.' [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver' [citation]." (*City of Ukiah* v. *Fones* (1962) 64 Cal.2d 104, 107-108 [48 Cal.Rptr. 865, 410 P.2d 369]; *DRG/Beverly Hills, Ltd.* v. *Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 [35 Cal.Rptr.2d 515] [" ' "Waiver always rests upon intent." ' "]; *Brookview Condominium Owners' Assn.* v. *Heltzer Enterprises-Brookview* (1990) 218 Cal.App.3d 502, 512 [267 Cal.Rptr. 76]; *National Union Fire Ins. Co.* v. *Siliconix Inc.* (N.D.Cal. 1989) 726 F.Supp. 264, 270 [applying California law, and finding no waiver in absence of evidence insurer had intentionally relinquished right to contest coverage].) The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. (*Brookview Condominium Owners' Assn.*, *supra*, 218 Cal.App.3d at p. 513.)

As T.I.E. observes, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. (*State Farm Fire & Casualty Co.* v. *Jioras* (1994) 24

Cal.App.4th 1619, 1628, fn. 7 [29 Cal.Rptr.2d 840] ["Waiver depends solely on the intent of the waiving party, and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights."]; cf. *Titan Corp.* v. *Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 467 [27 Cal.Rptr.2d 476]; *Velasquez* v. *Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 722 [5 Cal.Rptr.2d 1] ["Whether a waiver has occurred depends solely on the intention of the waiving party. [Citation.] An intention to waive a limitations provision is not evinced by the failure to raise that point in a letter denying a claim."]; *California Union Ins. Co.* v. *Poppy Ridge Partners* (1990) 224 Cal.App.3d 897, 902 [274 Cal.Rptr. 191] [insurer's reliance on particular policy provision to deny coverage does not preclude insurer from later claiming rights under other provisions]; contra, *Alta Cal. Regional Center* v. *Fremont Indemnity Co.* (1994) 25 Cal.App.4th 455, 466 [30 Cal.Rptr.2d 841] [dictum stating that where insurance contract does not provide coverage but insurer fails to assert correct ground for denying coverage, automatic waiver doctrine permits insured to receive coverage where none exists].)

Of the 33 sister states to consider the issue, 32 agree with the California rule. (See, e.g., *Schiff Assoc.* v. *Flack* (1980) 51 N.Y.2d 692, 699 [435 N.Y.S.2d 972, 417 N.E.2d 84] [no waiver of coverage defenses by failure to assert them in disclaimer notice]; *Tobi Engineering* v. *Nationwide Mut. Ins.* (1991) 214 Ill.App.3d 692 [158 Ill.Dec. 366, 574 N.E.2d 160, 162] [insurer not required to assert all defenses to liability in denial letter to insured]; *Terre Haute First Nat.* v. *Pacific Employers* (Ind.App. 1993) 634 N.E.2d 1336, 1337 [no waiver of defenses to coverage in absence of prejudice to insured]; and cases cited in Berg & O'Connell, *Waiver and Estoppel Without Waste: Titan Corp.* v. *Aetna Casualty & Surety Co.* (1995) 17 Ins. Litig. Rptr. 13, 19, fn. 59.) Still other states have held that the doctrine of waiver cannot be applied to expand coverage. (See, e.g., *Pearce* v. *American Defender Life Ins. Co.* (1986) 316 N.C. 461 [343 S.E.2d 174, 177].) Only one state has held that an insurer waives coverage defenses not stated in its initial denial letter. (*Armstrong* v. *Hanover Insurance Company* (1971) 130 Vt. 182 [289 A.2d 669, 672].)

Notwithstanding the foregoing weight of authority, plaintiffs rely on the automatic waiver rule announced in dictum in *McLaughlin* v. *Connecticut General Life Ins. Co.* (N.D.Cal. 1983) 565 F.Supp. 434. In attempting to predict what this court would do when faced with the waiver issue, the *McLaughlin* v. *Connecticut General Life* court held that "an insurance company which relies on specified grounds for denying a claim thereby waives the right to rely in a subsequent litigation on any other grounds which a reasonable investigation would have uncovered." (*Id.* at p. 451.) The federal

district court relied on this court's decisions recognizing the insurer's duty to conduct a reasonable investigation in order to comply with the covenant of good faith and fair dealing. (*Ibid.*; see also *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141].)

T.I.E. and Farmers assert *McLaughlin* v. *Connecticut General Life Ins. Co.*, *supra*, 565 F.Supp.434, has been superseded by the Ninth Circuit decision in *Intel Corp.* v. *Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551, 1559 (hereafter *Intel*), which concluded that "in *McLaughlin* it was necessary to find waiver to protect insureds who had been misled by the insurer's statements as to the denial of coverage." (*Intel*, *supra*, 952 F.2d at p. 1560.) Nonetheless, the *Intel* court rejected application of an automatic waiver rule and determined that under California law, an insurer waives defenses to coverage not asserted in its denial only if the insured can show misconduct by the insurer or detrimental reliance by the insured. (*Ibid.*; see *Aceves* v. *Allstate Ins. Co.* (S.D.Cal. 1993) 827 F.Supp. 1473, 1476-1477 [under *Intel* insurer may raise all available defenses to coverage at any time unless the insured proves detrimental reliance].) Plaintiffs urge us to reject the reasoning of *Intel* on the grounds that it (1) blurs the waiver-estoppel doctrines and erroneously applies the estoppel doctrine of detrimental reliance to issues involving waiver, (2) would preclude prompt, summary adjudication of legal issues pertinent to the meaning of the words of denial, and (3) would lead to a proliferation of bad faith lawsuits. Plaintiffs assert that the *McLaughlin* automatic waiver rule "provides an incentive for carriers to promptly disclose bases for denial [and] reduces or eliminates litigation by means of a rule easy to understand and apply."

We agree with *Intel*, *supra*, 952 F.2d at page 1559, and decline to follow the *McLaughlin* rule of automatic waiver. A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed. Such a conclusion would contradict the holdings of the majority of California and sister-state cases addressing the waiver issue. (See, e.g., *Velasquez* v. *Truck Ins. Exchange*, *supra*, 1 Cal.App.4th 712, 722.)

As the *Intel* court recognized, in the insurance context the terms "waiver" and "estoppel" are sometimes used interchangeably, even though estoppel requires proof of the insured's detrimental reliance. (*Intel*, *supra*, 952 F.2d at p.1560.) Nonetheless, as the *Intel* court observed, "[w]aiver is an affirmative defense, for which the insured bears the burden of proof," and "California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an

intent to enforce the right as to induce a reasonable belief that such right has been relinquished." (*Id.* at p. 1559.) The present facts do not show that T.I.E.'s denial letter indicated an intention on the part of the insurer to relinquish additional reasons for denial of a duty to defend. Nor have plaintiffs shown that T.I.E.'s actions following its defense denial were inconsistent with its intent to enforce the terms of the policy. Accordingly, plaintiffs have not shown that T.I.E.'s denial of a defense induced a reasonable belief in plaintiffs that T.I.E. intended to waive additional policy defenses. To the extent *Alta Cal. Regional Center* v. *Fremont Indemnity Co.*, *supra*, 25 Cal.App.4th at page 466, relies on *McLaughlin* v. *Connecticut General Life, Ins. Co.*, *supra*, 565 F.Supp. 434, and its rule of automatic waiver, it is disapproved.

### 2. *Estoppel*

Plaintiffs also assert that notwithstanding our resolution of the *McLaughlin* waiver issue, T.I.E. should be estopped from denying a duty to defend on the basis of *Keating* and its progeny because the insurer anticipated the *Keating* decision at the time it denied a defense to the Amey action, but failed to state "economic loss" as a reason for denying a defense in its denial letter. This allegedly "wrongful conduct" by the insurer, plaintiffs claim, precluded plaintiffs from developing "facts [showing that] Amey's alleged bodily injury arose from causes other than economic loss."

As T.I.E. observes, however, proof of estoppel requires a showing of detrimental reliance by the injured party. (See *State Farm Fire Casualty co.* v. *Jioras*, *supra*, 24 Cal.App.4th at pp. 1627-1628; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, p. 859.) Plaintiffs do not show how they relied to their detriment on T.I.E.'s grounds for denial. In the absence of any such proof, plaintiffs cannot show detrimental reliance on the grounds for denial of a defense.

In the present case, T.I.E.'s letter denying a defense and coverage on the ground that the Amey complaint represented nothing more than a "shareholder dispute" based on "intentional acts" unequivocally informed plaintiffs that the insurer was denying coverage under the terms of the policy. A "shareholder dispute" is essentially a "business dispute" and, in the context of the Amey allegations as set forth in the second amended complaint, would never give rise to the potential for coverage under T.I.E.'s CGL policy. T.I.E.'s denial letter thus adequately explained the factual basis for the insurer's rejection of a defense. (See Cal. Code Regs., tit. 10, § 2695.2, subd. (z) [insurer's denial of claim shall be in writing and shall provide factual basis of denial that is within the insurer's knowledge at the time claim is

denied].) Moreover, the fact that coverage was defined in terms of an "event" as opposed to an "accident" could in no way lead to potential coverage for business torts, whether these torts are characterized by the insured as "intentional" or "negligent" acts. As noted above, T.I.E.'s CGL policy provided coverage for tangible or physical property losses and bodily injury caused by an "occurrence." Because the "occurrence" here was the ongoing business dispute between Amey and plaintiffs, the allegations in the Amey complaint fell outside the scope of T.I.E.'s CGL coverage. (*Giddings, supra*, 112 Cal.App.3d 213.) Accordingly, plaintiffs' alleged detrimental reliance on T.I.E.'s initial denial letter could not give rise to a claim for estoppel because plaintiffs never reasonably believed, nor could they reasonably believe, that the T.I.E. policy provided a potential for coverage for Amey's lawsuit.

### D. *Bad Faith*

We next consider whether plaintiffs may state causes of action for either breach of the implied covenant of good faith and fair dealing or violation of Insurance Code section 790.03 for unfair business practices, when the policy does not provide such coverage by its terms. We do so after recognizing that the present case was not final when we held that section 790.03 confers no private right of action for damages. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58] [decision will be applied prospectively]; see also *Zepher Park* v. *Superior Court* (1989) 213 Cal.App.3d 833, 837-838 [262 Cal.Rptr. 106] [*Moradi-Shalal* applies to first party actions].)

In its original decision, the Court of Appeal noted at the beginning of its discussion that because a contractual obligation is the underpinning of a bad faith claim, such a claim cannot be maintained unless policy benefits are due under the contract. (See, e.g., *Love* v. *Fire Ins. Exchange, supra*, 221 Cal.App.3d 1136, 1153.) After finding that T.I.E. owed no duty to defend the Amey action, the Court of Appeal concluded that because there was no contractual liability on the part of T.I.E., plaintiffs could not assert a valid bad faith claim. (*Id.* at p. 1151.) Accordingly, the Court of Appeal concluded, Farmers also could not be found liable for bad faith conduct. Although the court ignored the issue of T.I.E.'s (and Farmers's) liability under Insurance Code section 790.03, on petition for rehearing the opinion was modified to add a citation to *Brodkin* v. *State Farm Fire & Casualty Co.* (1989) 217 Cal.App.3d 210, 218 [265 Cal.Rptr. 710], which held that "there can be no cause of action for breach of the covenant of good faith *or of any statutory duty*" because the insurer defendant had properly denied the claim under the policy. (Italics added.) We agree with the Court of Appeal.

It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer. (*Love* v. *Fire Ins. Exchange, supra,* 221 Cal.App.3d 1136, 1151-1153.) As the *Love* court observed, its "conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is [firmly] rooted." (*Id.* at p. 1153.) The legal principle is based on general contract law and the long-standing rule " 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032], citing *Communale* v. *General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198]; see also *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818.) In sum, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. (*Love, supra,* 221 Cal.App.3d at p. 1153.) Thus, as the *Love* court noted, when benefits are due an insured, "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because" they frustrate the insured's right to receive the benefits of the contract in "prompt compensation for losses." (*Ibid.*) Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and "should not be endowed with an existence independent of its contractual underpinnings." (*Ibid.*)

When evaluating an insurer's alleged violation of Insurance Code section 790.03, we are guided by the principles of first party coverage, and the fact that the insurer owes its insured an independent duty to process all claims submitted to it in a reasonable manner, and not to delay, to the insured's prejudice, the ultimate decision to defend or indemnify. For example, where an insurer undertakes a defense under a reservation of rights, and then fails to pursue the defense in a reasonable manner, the insurer may be subject to penalties under section 790.03. (See, e.g., *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 190 [231 Cal.Rptr. 791] [insurer must process all claims submitted to it competently even when no coverage will be provided].) Thus, our holding does not foreclose the insurance commissioner from imposing administrative sanctions against an insurance company responsible for committing unfair practices that are independent of the insurance contract and proscribed by section 790.03. (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies, supra,* 46 Cal.3d at p. 304.)

In the present case, however, we cannot say that the Court of Appeal erred in concluding neither T.I.E. nor Farmers violated Insurance

Code section 790.03. There is no indication that either defendant unnecessarily delayed performing its investigative duties under the policy or misled plaintiffs into believing it would provide either a defense or coverage to the Amey complaint, and any finding to the contrary would misconstrue the record.

CONCLUSION

If an insurance policy provides no potential basis for coverage, the insurer is under no duty to defend an action against the insured. (*Gray*, *supra*, 65 Cal.2d at p. 276.) We conclude T.I.E.'s CGL policy provided no potential for coverage in a suit based on business and economic torts. Because T.I.E. was under no obligation to defend or indemnify the Amey action, it did not breach the implied covenant of good faith and fair dealing. In addition, T.I.E.'s denial of a defense did not independently violate Insurance Code section 790.03. The same holding applies to Farmers, as T.I.E.'s adjuster. We therefore conclude the Court of Appeal's judgment should be affirmed.

Mosk, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Insurance policies are, first and last, contracts. This court has repeatedly emphasized that by and large an insurance policy is interpreted no differently than any other contract, and that when the parties express their intent in unambiguous language in the policy, that intent governs. Although courts have evolved special rules for interpreting ambiguities in insurance policies, what these rules have in common is that they protect the insured. No special rules have developed that deny an insured coverage that an insurer has promised in unambiguous policy language.

In this case, the majority makes a sharp departure from the mainstream of insurance coverage law. Rather than hewing to the language of the insurance policy at issue in this case, the majority concludes that coverage within the ordinary and unambiguous meaning of the policy language does not exist.

Specifically, the majority holds that the liability insurance policy issued by defendant insurers excludes coverage for bodily injuries related to economic (i.e., intangible property) losses. The majority errs in doing so, for its conclusion finds no support in the language of the policy or in any other evidence of the mutual intent of defendant insurers and plaintiff insureds. The plain language of the policy covers liability for all bodily injuries caused by an "occurrence." The policy defines "occurrence" as any "event, or series of events . . . proximately caused by an act or omission of the

insured . . . which results . . . in bodily injury . . . neither expected nor intended from the standpoint of the insured." Nothing in the ordinary meaning of this language, and nothing in the rest of the policy, excludes coverage for bodily injuries resulting from events that either themselves are economic losses or cause economic losses in addition to bodily injury.

Because the majority's approach has no support in our law or in the language of the contract at issue here, I disagree with the majority's reasoning. As I shall explain, however, I would nonetheless affirm the judgment of the Court of Appeal because there is an independent reason why defendant insurers properly denied coverage here: Plaintiff insureds sought coverage under the bodily injury coverage of the insurance policy for a lawsuit alleging they had intentionally caused someone to suffer emotional and physical distress; the insurance policy excludes coverage for bodily injuries expected or intended by the insureds, such as the intentional injuries alleged against the insureds; thus, there was no coverage under the policy for the lawsuit against plaintiff insureds.

## I

Waller owned 60 percent of Marmac, Inc. (Marmac) and was its president; Amey owned 40 percent and was its vice-president. Waller sold his stock to Marmac employees Akers, Hendrix, Hepple, and Petersen (referred to hereafter collectively with Waller and Marmac as the insureds), who thereafter demoted and ultimately terminated Amey.

Amey sued the insureds. Amey alleged 12 causes of action in his amended complaint, including, as relevant here, one for the intentional infliction of emotional distress.

In his cause of action for emotional distress, Amey alleged that he suffered "humiliation, mental anguish, and emotional and physical distress" from the "conduct" of the individual insureds alleged in the other causes of action (for example, Waller's sale of his stock to Akers, Hendrix, Hepple, and Petersen without notice to Amey and allegedly in breach of a contract to sell the stock to Amey; the alleged interference by Akers, Hendrix, Hepple, and Petersen with Amey's contract with Waller for the sale of Waller's stock; Amey's demotion and subsequent termination in breach of his employment contract with Marmac; Akers, Hendrix, Hepple, and Petersen's bad faith abuse of their positions as controlling shareholders and directors to engage in self-dealing and to deny Amey a voice in corporate affairs). Amey alleged that the individual insureds' conduct had been "intentional and malicious and . . . done for the purpose of causing Amey . . . emotional

and physical distress." At his deposition, Amey testified he had suffered headaches, back pains, and rashes as a result of the individual insureds' conduct.

The insureds were insured under a policy issued by Truck Insurance Exchange through Farmers Insurance Exchange (collectively Truck). The insureds tendered their defense to Truck, which rejected it on the ground that Amey's causes of action were not covered under the policy. The insureds sued Truck for bad faith denial of its duty to defend, contending that Amey's cause of action for emotional distress was covered under the Truck policy. The insureds also alleged that Truck had breached its duties under Insurance Code section 790.03, subdivision (h), which prohibits various acts and practices by insurers in processing and settling the claims of their insureds. In a bifurcated proceeding, the trial court held that Amey's cause of action for emotional distress was covered under the policy and, accordingly, Truck had a duty to defend; a jury then determined that Truck had also breached its duties under Insurance Code section 790.03, subdivision (h).

The Court of Appeal reversed, holding that the Truck policy did not cover bodily injury related to economic loss, and holding that there could be no cause of action under Insurance Code section 790.03, subdivision (h) because there was no coverage under the Truck policy.

## II

Whether Truck had a duty to defend turns on whether the relevant facts or pleadings give rise to any potential for coverage under the policy. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 277 [54 Cal.Rptr. 104, 419 P.2d 168].) The insureds contend that there was the potential for coverage under the policy of Amey's cause of action for intentional infliction of emotional distress. I conclude that there was no potential for coverage because Amey's cause of action fell within the policy's exclusion of injuries expected or intended by the insured.

In *La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048], this court recently summarized the principles governing the interpretation of insurance contracts: " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253].) 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of

the parties. (Civ. Code, § 1636.)' (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264.) 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 822.) 'If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)' (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264.)"

Application of these principles yields a straightforward resolution of this case. No party has put forward extrinsic evidence bearing on the interpretation of the policy. Therefore, it is solely the language of the policy that determines whether coverage exists.

The coverage clause of the policy obligates the insurer to "pay all damages which the insured becomes legally obligated to pay because of [¶] (C) *bodily injury* to any person . . . [¶] . . . [¶] . . . [¶] . . . *caused by an occurrence*." (Italics added.) The question of coverage therefore turns on whether there was "bodily injury" caused by an "occurrence."

Did Amey allege a "bodily injury" within the meaning of the policy? The policy defines "bodily injury" as "bodily injury, sickness, or disease." Amey alleged in his complaint that he had suffered both emotional and physical distress as a result of the insureds' conduct. At his deposition, Amey testified that the insureds' conduct had caused him to suffer headaches, back pains, and rashes.[1]

Most of the courts that have addressed the issue have held that any physical manifestations accompanying emotional distress are "bodily injuries" as that term is used in insurance policies. (*Aim Ins. Co.* v. *Culcasi* (1991) 229 Cal.App.3d 209, 220, 226 [280 Cal.Rptr. 766]; *Employers Cas. Ins. Co.* v. *Foust* (1972) 29 Cal.App.3d 382, 387 [105 Cal.Rptr. 505]; *Garvis* v. *Employers Mut. Cas. Co.* (Minn. 1993) 497 N.W.2d 254, 257 ["emotional distress with appreciable physical manifestations can qualify as a 'bodily injury' within the meaning of the insurance policy"; as here, policy defined "bodily injury" as "bodily injury, sickness, or disease"]; *Voorhees* v. *Preferred Mut. Ins. Co.* (1992) 128 N.J. 165, 179 [607 A.2d 1255, 1262, 8 A.L.R.5th 937]; Ostrager & Newman, Handbook on Insurance Coverage Disputes (7th ed. 1994) § 7.03[a][3][B], pp. 237-238 [collecting cases]; see also *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1078-1079 [9 Cal.Rptr.2d 615, 831 P.2d 1197] [physical symptoms of emotional distress are "physical injury"]; *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 929 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]

---

[1]The insureds renewed their tender of defense on the basis of Amey's deposition testimony; Truck never responded.

[same].) On its face, the policy's definitional language, "bodily injury, sickness, or disease," broadly covers any somatic condition, and does not exclude those that are caused or accompanied by mental distress. Although I therefore assume for purposes of this case that at least the physical symptoms Amey alleged he suffered were "bodily injuries" within the meaning of the policy, it is not necessary to decide the issue because I conclude, for the reasons discussed below, that there was no "occurrence" within the policy's definition of that term.

Were Amey's "bodily injuries" caused by an "occurrence"? The policy defines "occurrence" to mean "an *event*, or series of events, including injurious exposure to conditions, *proximately caused by* an act or omission of *the insured* regardless of the number of persons, vehicles or objects affected by such act or omission *which results*, during the policy period, in *bodily injury* or property damage, *neither expected nor intended* from the standpoint of the insured." (Italics added.) Stated otherwise, the elements of an "occurrence" can be broken down into (1) an event or series of events (2) proximately caused by the insured (3) resulting in bodily injury or property damage, (4) with the injury or damage being neither expected nor intended.

The majority and I agree on the elements of the "occurrence" definition. (See maj. opn., *ante*, at p. 20 ["to demonstrate a potential for coverage under [Truck's] policy, an insured must show the claim he must defend is an alleged act or omission that caused bodily injury or tangible property damage (as defined by the policy) to the third party, and that the alleged injury was neither expected nor intended by the insured"].) The majority, however, never applies these elements to the facts of this case to determine whether there was a potential for coverage of Amey's claims against the insureds. Accordingly, I do so here.

The first element of the definition of "occurrence" requires an "event, or series of events."[2] The conduct of plaintiffs that Amey alleged caused his injury (e.g., his demotion, the sale of stock from Waller to the other four plaintiffs) certainly was a series of events in the ordinary meaning of the term.

---

[2]The requirement of an "event" that causes injury is a departure in Truck's policy from the language of the current standard commercial general liability (CGL) policy drafted by the Insurance Services Office (an insurance industry trade group). The standard CGL policy requires that an "accident," not an "event," cause the injury. (Insurance Services Office, Commercial General Liability Coverage Form (eff. Jan. 1, 1986), reprinted in 3 Cal. Insurance Law and Practice (1995) Business General Liability Policies, appen. C.) The Truck policy represents a broadening of coverage in that the cause of injury no longer need be sudden and fortuitous, as it must be under an "accident" occurrence clause. (Compare *United Pacific Ins. Co.* v. *McGuire Co.* (1991) 229 Cal.App.3d 1560, 1565 [281 Cal.Rptr. 375] ["the word 'event' is not limited to fortuitous happenings"] with *Shell Oil Co.* v. *Winterthur Swiss*

The second element of "occurrence" requires that the insured proximately cause the event or events. There is no dispute that the events alleged by Amey to have caused his injury were ones that he alleged the individual insureds had proximately caused.

The third element of "occurrence" requires, as relevant here, that the events result in bodily injury. As I have already explained, to the extent Amey suffered physical manifestations of his emotional distress, I assume the events resulted in bodily injury.

The fourth element of the definition of "occurrence" requires that the bodily injury be "neither expected nor intended from the standpoint of the insured." It is on this point that the insureds' claim for coverage fails. The intentional infliction of emotional distress that Amey alleged is not an occurrence within the policy's definition because the tort requires that the insured either intend or expect that the emotional distress (and any accompanying physical manifestations) occur. "The tort calls for intentional, or at least reckless conduct—conduct intended to inflict injury or engaged in with the realization that injury will result." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 210 [185 Cal.Rptr. 252, 649 P.2d 894].) To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege "that the conduct of . . . the defendants was directed primarily at them, was calculated to cause them severe emotional distress, or was done with knowledge of their presence and of a substantial certainty that they would suffer severe emotional injury." (*Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 906 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

Any injury caused by the insured that is calculated (i.e., intended), or which the insured knew was substantially certain to result from the insured's conduct, however, is an injury that the insured "expected or intended." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, *supra*, 12 Cal.App.4th at pp. 745-748 [insured "expected or intended" a result if the insured intended the result or believed the result was substantially certain or highly likely to occur].) Because the intentional infliction of emotional distress is an injury that is either "calculated" by the insured or that the insured knew was "substantial-[ly] certain[]" to result (*Christensen* v. *Superior Court*, *supra*, 54 Cal.3d at p. 906), policy language that, as here, excludes from coverage acts that the insured "expected or intended" thereby excludes coverage of any cause of action for the intentional infliction of emotional distress.

---

*Ins. Co.* (1993) 12 Cal.App.4th 715, 751 [15 Cal.Rptr.2d 815] [discussing "accident" occurrence clause's requirements of suddenness and fortuity].)

In this respect, the majority is mistaken in describing the Truck policy as a "standard" CGL policy. (See maj. opn., *ante*, at p. 19.)

In this case, Amey specifically alleged that the insureds' acts were intended to cause him both emotional and physical injury. Both Amey's original complaint and his amended complaint alleged that the conduct of the insureds "was intentional and malicious and was done for the purpose of causing Amey to suffer humiliation, mental anguish, and emotional and physical distress." The definition of "occurrence" in the Truck policy excludes events resulting in injuries that the insured expects or intends. (See *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, *supra*, 12 Cal.App.4th at pp. 745-748.) Therefore, Amey's cause of action for intentional infliction of emotional distress cannot be a covered occurrence because it alleged that the insureds intended the emotional and physical injuries that they caused him.[3] (Accord, *Smith* v. *State Farm Fire and Cas. Co.* (1985) 127 Wis.2d 298, 302-304 [380 N.W.2d 372, 374-375].) Because there was no potential for coverage under the policy's definition of "occurrence" for the emotional and physical distress the insureds allegedly intentionally caused to Amey, Truck properly denied the insureds' tender of their defense.[4]

### III

The majority, however, ignores the controlling language of the policy that I have just discussed. Instead, the majority manufactures an exclusion of bodily injuries "related to" economic losses that has no basis in the policy language or in any other indicia of the parties' intent, and on that ground concludes there was no potential for coverage of Amey's lawsuit against the insureds. The majority asserts that because the events underlying Amey's lawsuit caused uncovered "economic" (i.e., intangible property) losses to Amey, there can be no coverage for any bodily injuries to Amey that were

---

[3]The insureds do not contend that, although Amey's complaint was limited to the intentional infliction of emotional distress, he might have ultimately recovered damages for emotional and physical distress on a theory that those injuries were negligently inflicted and that therefore there was a potential for coverage. (See *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 276.)

[4]Truck denied coverage to the insureds on the ground that "Intentional Acts are not covered . . . ." Although inartfully phrased (because it focuses on intentional acts rather than intentional damage or injury), it seems clear that the purpose of Truck's letter was to invoke the "neither expected nor intended" language of the "occurrence" definition. Because I conclude that there was no potential for coverage for the same reason, I find it unnecessary to address the waiver and estoppel arguments addressed in section C of the majority opinion. Likewise, I do not have occasion to address the retroactivity and legal uncertainty issues considered by the majority. (Maj. opn., *ante*, at pp. 24-26.) Nor is it necessary for me to address the other alternative grounds for denying coverage put forward by Truck. (See maj. opn., *ante*, at p. 20, fn. 1.)

I concur in the majority's decision that in the absence of any potential for coverage the insureds do not have a cause of action against Truck for its alleged violation of its duties under Insurance Code section 790.03, subdivision (h) with respect to its processing and resolution of the insureds' claim for coverage.

caused by, or even related to, the same events. Under the majority's view, there is no coverage for bodily injuries that are in any way related to economic losses.

On what basis does the majority reach this conclusion? Instead of closely analyzing the policy language to determine whether coverage exists, the majority engages in a lengthy recitation of three cases on which the Court of Appeal relied, and then in a conclusory paragraph asserts that "CGL policies do not provide coverage for economic losses that cause emotional distress. . . . These policies were never intended to cover emotional distress damages that flow from an uncovered 'occurrence,' . . ." (Maj. opn., *ante*, at p. 23.) Accordingly, the majority concludes that there was no potential for coverage because "[a]ll allegations in the Amey complaint were related to Amey's asserted *economic loss* as a Marmac shareholder." (*Ibid.*)

The majority's conclusion is wrong. The majority's exclusion of all bodily injuries "related to" an economic loss is an unsupportable judicial rewriting of the insurance contract at issue here. The majority does not and cannot justify its sweeping statements by anything found in the language of the policy. Contrary to the majority's conclusion, nothing in the language of the insureds' policy with Truck excludes coverage for bodily injuries that are "related to" (maj. opn., *ante*, at p. 23) economic losses. The Truck policy's definition of "bodily injury" does not exclude injuries that are caused by or related to economic losses. It covers all "bodily injury, sickness or disease," regardless of the cause.

Likewise, the Truck policy's definition of "occurrence" broadly encompasses any "event, or series of events," that "results in . . . bodily injury," whether or not one of the events in the chain of causation also causes a concurrent economic loss or is itself an economic loss.[5] The policy's definition of "occurrence" nowhere excludes from that term events that either are economic losses or are "related to" economic losses. The ordinary meaning of "event" is "something that happens." (Webster's New Collegiate Dict. (9th ed. 1988) p. 430.) An economic loss is "something that happens."

Thus, there is nothing in the policy language that limits "occurrence," as the majority does, to "an event based on a noneconomic act" (maj. opn., *ante*, at p. 26). Rather, as I set forth earlier, the policy defines an "occurrence" to include events that result in bodily injury. An occurrence does not become a nonoccurrence simply because the event causes both bodily injury and economic loss.

---

[5]In this part, I put aside for the moment the "neither expected nor intended" portion of the Truck policy's definition of "occurrence" that I discussed previously in part II, as the majority does not base its exclusion of bodily injuries related to economic losses on that language.

The majority's erroneous conclusion arises from its mistaken view that the bodily injury and property damage coverages of the Truck policy are somehow interdependent, and that therefore "the occurrence or act leading to coverage must be an injury to tangible property, not to one's economic interest." (Maj. opn., *ante*, at p. 26.) The majority's conclusion is contrary to the express policy language at issue in this case.[6]

The coverage clause of the policy obligates the insurer to "pay all damages which the insured becomes legally obligated to pay because of [¶] (C) *bodily injury* to any person, and [¶] . . . [¶] (E) damage to property . . . [¶] to which this insurance applies, *caused by an occurrence*." (Italics added.) The bodily injury coverage (which the policy refers to as "Coverage C") is independent of the property damage coverage (which the policy refers to as "Coverage E"). Coverage E and coverage C, for example, are subject to different exclusions, can be separately purchased, and can be subject to different liability limits. The coverage clause does not require that for a bodily injury to be covered under coverage C it must be caused by property damage covered under coverage E. Likewise, under the policy's definition of occurrence, it is irrelevant whether the event resulting in bodily injury under coverage C takes the form of property loss that is not covered under coverage E; all that is necessary is that the event, whatever its nature, "result[] in . . . bodily injury."

The majority is therefore wrong in its assertion that coverage for bodily injury under coverage C is limited to events that also cause property damage that is covered under coverage E. ("[T]he occurrence or act leading to coverage [for bodily injury under coverage C] must be an injury to tangible property [i.e., property damage covered under coverage E], not to one's economic interest." Maj. opn., *ante*, at p. 26.) The Truck policy independently covers either property damage *or* bodily injury resulting from an event or series of events proximately caused by an insured, regardless of the nature of the intermediate events in the chain of causation.

The majority maintains nonetheless that it was the "intent of the parties" to exclude from coverage bodily injuries related to economic losses. (Maj. opn., *ante*, at p. 28.) But the majority offers no evidence that the parties here mutually held this supposed intent. What the majority calls the "intent" of the parties is actually its own opinion of how insurance policies should be drafted. It is not this court's function, however, to draft or redraft insurance policies. The true intent of the parties in this case is the meaning to be found in the language of the policy—nothing more, nothing less. As the analysis

---

[6]The majority's conclusion is also contrary to its acknowledgment elsewhere that "the CGL policy provides coverage for 'occurrences' that cause bodily injury *or* tangible property losses." (Maj. opn., *ante*, at p. 23, italics added.)

above reveals, the policy language reflects no intent to exclude all bodily injuries related to economic losses.

Nor are the three cases relied on by the majority and by the Court of Appeal persuasive. Like the majority, those decisions failed to ground their conclusions in the contractual language before them. In the first of those cases, *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 857 [13 Cal.Rptr.2d 318], defrauded investors sought to recover from the insurer of a corporation's directors and officers for the emotional distress (without any physical symptoms) caused by "the loss of their investment." The Court of Appeal in *Chatton* concluded that emotional distress without accompanying physical manifestations is not "bodily injury" for purposes of a policy containing the same "bodily injury" definition that is at issue here. (*Id.* at pp. 853-857.) Although this holding was dispositive of the case, since the shareholders had not claimed any physical symptoms, the court went on to conclude that the wrongful acts also were not accidental and therefore were not "occurrences" under a policy definition that, unlike the policy in this case, required that occurrences be accidents, not merely events. (*Id.* at pp. 860-862.) Finally, *Chatton* held that when a policy provides coverage for bodily injury *or* tangible property damage, there is no coverage for bodily injuries caused by intangible property loss. (*Id.* at pp. 857-860.)

The Court of Appeal in *Chatton* based its conclusion that the policy before it excluded coverage for bodily injuries caused by intangible property loss on its assertion that "the 'bodily injury' clause of the CGL policy . . . incorporated coverage for loss or destruction of tangible property as well." (*Chatton* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th at p. 860.) The court, however, did not explain how the bodily injury coverage "incorporated" the property damage coverage, nor could it have done so, for in *Chatton,* as here, the two forms of coverage were independent. Like the majority, the *Chatton* court erroneously collapsed the two forms of coverage together. *Chatton* failed to recognize that any bodily injuries, whatever their cause, were independently covered under the bodily injury coverage, and it viewed bodily injury caused by economic loss only as a form of consequential damages accompanying an uncovered intangible property loss. The two cases that follow *Chatton,* and on which the majority also relies, *Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154, 156-157, and *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1150-1151 [29 Cal.Rptr.2d 559], adopt *Chatton*'s faulty analysis without adding anything to it.[7]

In addition to being contrary to the language of the Truck policy, the majority's adoption of *Chatton*'s approach is at odds with this court's

[7]Nor does *Allstate Ins. Co.* v. *Interbank Financial Services* (1989) 215 Cal.App.3d 825 [264 Cal.Rptr. 25] support the majority's holding. *Allstate* involved a policy with language quite different from either the Truck policy at issue in this case or the standard CGL policy. In

decision in *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1084 [17 Cal.Rptr.2d 210, 846 P.2d 792]. *Horace Mann* rejected the notion that the existence of a duty to defend turns on whether there is coverage for the "dominant factor" of the lawsuit. Rather, in determining the duty to defend, "[w]e look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy." (*Ibid.*, original italics.) *Horace Mann* thus precludes the majority's approach of excluding covered losses simply because they are "related to" (maj. opn., *ante*, at p. 30) uncovered losses that are the dominant factor in the lawsuit against the insured.

Even if the decisions in *Chatton* v. *National Union Fire Ins. Co.*, *supra*, 10 Cal.App.4th 846, *Keating* v. *National Union Fire Ins.*, *supra*, 995 F.2d 154, and *McLaughlin* v. *National Union Fire Ins. Co.*, *supra*, 23 Cal.App.4th 1132, were correct, they would be inapplicable on the facts of this case. The injured parties in the three cases just cited were defrauded investors who were emotionally distressed because they had lost money, not because of the content of the fraudulent statements or the other conduct by the insureds that caused them to lose money. Unlike the injured investors in those cases, however, Amey did not allege that his emotional and physical distress arose from the financial loss caused by the insureds. Rather, he alleged that his emotional and physical distress arose from his demotion and termination, his loss of influence and control over Marmac, and other "conduct" by the insureds—conduct that *in addition* caused him financial loss. Intangible economic loss was not the cause, only an accompaniment, of Amey's emotional and physical distress. Amey's distress and his economic loss were concurrent effects of the insureds' conduct, not successive effects as was the case in *Chatton*. Thus, here Amey's emotional and physical distress was independent of his economic loss in a way that was not true in *Chatton*.[8]

Nor can the majority's holding be justified by its assertion that the exclusion of bodily injury related to economic loss conforms to the "reasonable expectations" of the insureds. The reasonable expectations doctrine

*Allstate* the insureds were sued for economic losses (but not emotional or physical injuries) allegedly caused by erroneous and fraudulent investment advice they had provided. (*Id.* at pp. 827-828.) The policy in *Allstate* excluded coverage for damages " 'arising out of the rendering of or the failure to render . . . professional services, or consulting business . . . services.' " (*Id.* at p. 829.) The court held that under this exclusion there was no coverage under the policy for the lawsuit against the insureds; "the clear bases of the complaints are that the insureds gave poor professional advice . . . ." (*Id.* at p. 831.) That the quite different policy language in *Allstate* did not cover economic losses caused by the investment advice given by the insureds in that case says nothing about whether the Truck policy covers the insureds for the bodily injury they allegedly caused to Amey.

[8]Moreover, Amey claimed the insureds caused him emotional and physical distress by conduct that did not cause any accompanying economic loss. Amey testified at his deposition in his lawsuit against the insureds that the insureds had humiliated him by cutting his office telephone lines, packing his belongings and putting them out on the sidewalk, and humiliating him in front of a client. None of these acts caused economic loss to Amey. As I have noted

comes into play only when the language of an insurance policy relevant to a particular question of coverage is ambiguous. (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co., supra*, 9 Cal.4th at p. 37; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764].) As there is no ambiguous policy language to construe here, there is no basis for applying the reasonable expectations doctrine in this case. Even if there were some basis for applying it here, the doctrine requires a court to resolve the ambiguity in favor of the insured by extending coverage to the insured. (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co., supra*, 9 Cal.4th at p. 37; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) This court has never deployed the reasonable expectations doctrine as the majority does here to *deny* an insured coverage that is within the ordinary and unambiguous meaning of the policy language, and it is a misuse of the doctrine to do so.

The majority creates a blanket rule that no coverage exists under the bodily injury liability provisions of an insurance policy if the bodily injury is related to property damage not covered by the policy. That rule will restrict the bodily injury coverage provided by any policy that, like the Truck policy here, on its face covers bodily injury independent of whether or not any related property damage is covered by the policy. For example, assume a policy that provides coverage for bodily injuries, but not property damage, caused by the insured. The majority's reasoning would deny an insured coverage for any bodily injury caused by property damage (e.g., if the insured's car strikes and damages a tree that falls and injures someone) solely because there is no coverage for the property damage that is the immediate cause of the bodily injury.

### CONCLUSION

The ordinary meaning of the pertinent Truck policy language covers bodily injuries without regard for the nature of the event causing the bodily injury. The policy therefore covers bodily injuries that are caused by economic losses or, as here, are caused by an event that also causes an economic loss. Had Truck wanted to exclude coverage for bodily injuries related to economic loss, it could, as the drafter of the policy at issue in this case, have so provided. It is not the proper role of this court to manufacture coverage

---

previously, the insureds renewed their tender of defense on the basis of Amey's deposition testimony.

This case presents other distinctions as well from *Chatton* v. *National Union Fire Ins. Co., supra*, 10 Cal.App.4th 846. Unlike *Chatton*, here there was physical injury accompanying the emotional distress. Also unlike *Chatton*, here the Truck policy defines "occurrence" in terms of events, not accidents.

exclusions that are contrary to the express language of the policy, as the majority does here.

As I have previously explained, however, Amey's complaint did not allege an "occurrence" within the meaning of the Truck policy for a far different reason. The policy defines an "occurrence" as an event resulting in bodily injury *neither expected nor intended* by the insured. Amey alleged that the emotional and physical distress that he suffered was intended by the insureds. Because he alleged that the insureds intended to cause him those injuries, those injuries were not caused by an "occurrence" within the policy's definition of that term. It is on that ground that I would affirm the judgment of the Court of Appeal.

Respondents' petition for a rehearing was denied October 26, 1995, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.