**AMERICAN MEDICAL INTERNATIONAL, INC.,**
**Plaintiff–Appellee,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Defendant–Appellant.**

No. 97–56562.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 2000

Filed March 27, 2001

Peter Abrahams, Horvitz & Levy LLP, Encino, California; John G. Roberts, Jr., Hogan & Hartson, LLP, Washington, D.C., for the defendant-appellant.

Ronald M. Oster and Scott M. Flicker, Paul, Hastings, Janofsky & Walker, Los Angeles, California, for the plaintiff-appellee.

Before: BOOCHEVER, TROTT and BERZON, Circuit Judges.

BERZON, Circuit Judge:

In this diversity action, defendant-appellant National Union Fire Insurance Company of Pittsburgh ("National Union") seeks reversal of a $12 million jury verdict for its breach of an insurance policy's implied covenant of good faith and fair dealing. National Union contends that as a matter of law, the policy did not cover plaintiff-appellee American Medical International's ("AMI") underlying claims and therefore, under the California Supreme Court's decision in *Waller v. Truck Insurance Exchange, Inc.*, 11 Cal.4th 1, 44 Cal. Rptr.2d 370, 900 P.2d 619 (1995), National Union may not be held liable for a breach of the implied covenant. After considering National Union's coverage defenses, we conclude, in large part on the basis of a case decided by the California Court of Appeal after the district court decision giving rise to this appeal, that the policy did not cover AMI's asserted claims. We therefore reverse the district court's judgment and set aside the jury's award.

## I. Background

### A. Factual Overview

AMI is a Delaware corporation that owns and operates hospitals and medical research facilities. For close to a decade, it and National Union have been locked in this coverage dispute over a $5 million excess directors and officers ("D & O") insurance policy. That policy supplemented a $10 million primary D & O policy AMI purchased from the Harbor Insurance Company ("Harbor") and covered losses "arising from any claim ... against a director or officer of the corporation ... by reason of any wrongful act."

The events that gave rise to this dispute began in 1988 when several prospective purchasers approached AMI's board of directors with offers to buy the company. In order to manage the numerous bids and decide whether to accept one, AMI's board formed a special committee to consider a possible sale. The board appointed Harold Williams, a former chairman of the Securities Exchange Commission and a member of AMI's board, to head the committee.

The committee conducted what amounted to a silent auction and issued guidelines for bids and a deadline for offers from interested buyers. Three separate groups submitted bids. The board ultimately accepted an offer from the First Boston Corporation. Among the losing bidders was a group headed by Lee Pearce, a major investor in AMI and, like Williams, a director. Upon learning that AMI had denied his bid to buy the company, Pearce sold his shares and resigned from the board.

Shortly thereafter, several AMI shareholders filed separate class action lawsuits against Williams, Pearce and the other board members alleging misconduct in their handling of the sale. Pearce then filed a cross-claim against Williams and AMI, accusing Williams of treating his bid with animus and of specifically designing the auction to foil his attempt to buy the company.

Concerned about its potential liability, AMI requested permission from both Harbor and National Union to use the proceeds from its respective primary and excess D & O policies to settle the various suits. Harbor agreed, but only with regard to the shareholders' actions. Citing a provision in the policy which barred coverage for claims brought by "past, present or future directors or officers," it denied any obligation to cover losses stemming from Pearce's cross-claim.

AMI used the money from Harbor and settled the shareholders' suits for approximately $8.74 million. It then released Harbor from any further liability. AMI continued, however, to press National Union for permission to use the proceeds from its policy to settle Pearce's cross-claim. National Union steadfastly refused, noting that AMI had failed to exhaust the full $10 million of coverage from its primary policy and, in any case, that its poli-

cy, like Harbor's, did not cover the Pearce action.

Without the benefit of the policy's proceeds, neither AMI nor Williams was able to resolve their dispute with Pearce and the case went to trial. In the midst of the proceedings, however, National Union stepped in and brokered an unusual settlement between Pearce and Williams. National Union offered to pay Pearce $5 million, on the condition that Pearce release Williams from the suit but continue pressing his claims against AMI. Any amount Pearce won from AMI would then be deducted, dollar for dollar, from National Union's payment. In other words, for his release of Williams, National Union offered Pearce a $5 million guarantee: if by settlement or verdict, Pearce collected $3 million from AMI, National Union would pay the other $2 million; but if Pearce collected $5 million or more, National Union would pay nothing. The agreement's lone qualification was that National Union could refuse any settlement agreement that paid Pearce less than $4 million.

AMI vehemently objected to this "Mary Carter" agreement,[1] but Pearce accepted it and released his claims against Williams. AMI contends that Williams' settlement, which came in the midst of his trial testimony, amounted to a virtual confession of guilt before the jury and was devastating to AMI's defense. The trial nonetheless continued. While the jury deliberated, AMI settled with Pearce for $16 million, well above National Union's $5 million guarantee and more than enough to relieve it of any liability to Pearce.

Following the settlement, AMI filed the instant suit against National Union, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. A jury found National Union liable on both counts. Though the jury awarded no damages for the breach of contract, it did award AMI $12 million for National Union's breach of the implied covenant. When National Union appealed, this court, in an unpublished decision, affirmed the jury's verdict. The Supreme Court, however, noting the intervening *Waller* decision, granted certiorari and remanded the case for further consideration. *National Union Fire Ins. Co. of Pittsburgh v. American Med. Int'l, Inc.,* 516 U.S. 984, 116 S.Ct. 510, 133 L.Ed.2d 420 (1995). After the district court reinstated its judgment, National Union appealed once again.

### B. The Policy Provisions

As this case is now, in light of *Waller,* essentially a coverage dispute, the terms of the underlying policies are of utmost importance and so we review them briefly here. As noted above, the primary Harbor policy paid for losses, on behalf of the corporation

> arising from any claim or claims first made during the policy period against each and every person, jointly or severally, who was or now is or may hereafter be a director or officer of the corporation ... by reason of any wrongful act (as hereinafter defined) in their respective capacities as directors or officers of the corporation, but only when the corporation shall have indemnified the director or officer for damages, judgments, settlements, costs, charges or expenses incurred in connection with the defense of any action, suit or proceeding to which the directors or officers are a party or with which they are threatened or in connection with any appeal there from....

"Losses" covered by the policy included "any amount the corporation has paid to a

---

1. AMI accurately termed National Union's settlement offer a "Mary Carter" agreement, which is an arrangement between a plaintiff and a defendant whereby the exposure of liability of the settling defendant is limited, "usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non-settling defendant or defendants." Black's Law Dictionary 974 (6th ed.1990). The term comes from the case of *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.App.1967).

director or officer as indemnity for a claim or claims against him arising out of those matters set forth in the insuring clause above whether actual or asserted...." The term "wrongful act" applied to "any breach of duty, neglect, error, misstatement, misleading statement or omission by the directors or officers so alleged by any third party claimant solely by reason of their being such directors or officers." "Wrongful acts," however, specifically did not include "any act the directors or officers are alleged to have done or attempted to prevent the acquisition of the corporation or its securities by another company(ies), entity(ies) or individual(s) or any combination thereof...."

Several other exclusionary clauses in the Harbor policy further limited its scope. Of particular relevance to this case is an "insured-versus-insured" exclusion, which barred coverage for claims against the directors or officers brought

> by the corporation, its subsidiaries or successors or by one or more past, present or future directors or officers including their estates, beneficiaries, heirs, legal representatives, assigns or any affiliate of the company, or by any security holder of the company whether directly or derivatively except where such security holder bringing such claim is acting totally independently of, and totally without the solicitation of, or assistance of, or participation of, or intervention of, any director or officer of the company or any affiliate of the company.

National Union's excess policy followed "all the terms and conditions" of the primary Harbor policy. Unlike the Harbor policy, however, it specifically listed AMI as a "Named Insured," and although it did not include language expressly requiring exhaustion of the Harbor policy, it limited its liability to "$5,000,000 excess of $10,000,000" provided by the primary policy.

AMI was thus seeking coverage only for costs associated with Pearce's claims against director Williams. While it had no right under the policy for coverage of its own defense against or liability in Pearce's suit, AMI was an "insured," and sought damages for losses it incurred in the Pearce litigation as a result of National Union's alleged breach of the implied covenant of good faith and fair dealing contained in its contract with National Union.

## II. The Impact of *Waller*

### A. The Waller *Decision*

In its earlier review of this case, this court dismissed National Union's appeal without considering its various coverage defenses. Since that decision, however, the California Supreme Court's holding in *Waller* provided that where there is no coverage of any kind under an insurance contract, the insured may not hold the insurer liable for breach of the implied covenant of good faith and fair dealing. *Waller,* 11 Cal.4th at 37, 44 Cal.Rptr.2d 370, 900 P.2d at 639.

The plaintiffs in *Waller,* which included a corporation and its directors and officers, sought coverage under a commercial general liability ("CGL") policy for costs they incurred in defending a suit brought by a former company vice-president. *Id.* at 12–13, 44 Cal.Rptr.2d 370, 900 P.2d at 622. In his complaint, the vice-president alleged damages for emotional and physical distress which, according to the *Waller* plaintiffs, triggered the insurer's coverage obligations under the CGL policy. *Id.* The California Supreme Court, however, held that the claims stemmed from a business dispute between the parties, and that the alleged damages were either the direct result of or derivative of an economic loss suffered by the former vice-president. *Id.* at 15, 44 Cal.Rptr.2d 370, 900 P.2d at 625. Since the CGL policy did not cover economic losses or non-economic injuries caused by economic losses, there was no potential for coverage and therefore no coverage for defense costs. *Id.* Thus, the court concluded, the insurer had no obli-

gation at all to the company or to its directors and officers with respect to the suit by the former vice-president. *Id.* at 23, 44 Cal.Rptr.2d 370, 900 P.2d at 630.

The California Supreme Court then considered whether the *Waller* plaintiffs might nonetheless state a cause of action against their insurer for breach of the implied covenant of good faith and fair dealing. *Id.* at 35, 44 Cal.Rptr.2d 370, 900 P.2d at 638. It held that when the policy offered no coverage for either defense costs or indemnity, no such liability for breach of the implied covenant arose. The court observed that the implied covenant was "a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Id.* at 36, 44 Cal.Rptr.2d 370, 900 P.2d at 639. Without a right to coverage, the *Waller* court concluded, there is no obligation the insurer may frustrate. The court thus refused to extend the implied covenant "an existence independent of its contractual underpinnings," *id.* (quoting *Love v. Fire Ins. Exchange*, 221 Cal.App.3d 1136, 1153, 271 Cal.Rptr. 246 (1990)), and concluded that in the absence of an "obligation to defend or indemnify ... [the insurer] did not breach the implied covenant of good faith and fair dealing." *Id.* at 37, 44 Cal.Rptr.2d 370, 900 P.2d 619, 44 Cal.Rptr.2d 370, 900 P.2d at 639.

In light of the *Waller* holding, this court's earlier refusal to consider National Union's coverage defenses is inconsistent with California law. If National Union can establish that its excess policy did not cover any losses AMI might have incurred reimbursing Williams in connection with Pearce's cross-claim, then AMI may not state a cause of action for breach of the implied covenant of good faith and fair dealing. We therefore must consider whether any of those coverage defenses was valid in order to determine whether the "contractual underpinnings" of the implied covenant were present in this case.

## B. The Jury's Verdict

Before moving to the specific coverage defenses National Union raises on this appeal, however, we first consider its contention that the jury's decision not to award damages for breach of contract necessarily precludes its award for breach of the implied covenant of good faith and fair dealing under *Waller*.

An insurer violates the implied covenant when it frustrates the insured's efforts to collect benefits due under a policy. *Waller*, 11 Cal.4th at 36, 44 Cal.Rptr.2d 370, 900 P.2d at 639. Thus, it does not matter for purposes of liability under the implied covenant that an insurer avoids liability for breach of contract by finally making good on the policy after lengthy and unnecessary delay that injures an insured, or, as is alleged here, after taking some action concerning coverage that injures an insured. The *Waller* court specifically so acknowledged, stating that " 'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.' " *Id.* (quoting *Love*, 221 Cal.App.3d at 1153, 271 Cal.Rptr. 246). Thus, although benefits must have been *due*, they need not also have been wholly *denied* in order for an insured to maintain a cause of action alleging bad faith.

Considering the circumstances of the instant case, if, as the district court found, National Union owed benefits under the excess policy, the jury was entitled to find that its initial refusal to provide coverage to Williams was inconsistent with its obligations under their contract. Because Pearce eventually released Williams from the suit, however, pursuant to the "Mary Carter" agreement, AMI did not need to indemnify Williams for any costs he incurred and thus could have suffered no

losses covered by the policy as a result of National Union's refusal to provide defense or indemnity. Nonetheless, assuming that benefits had been due, the jury could have found that National Union's initial delay, the incentives the "Mary Carter" agreement provided to Pearce to continue his suit against AMI, and the timing of the deal with Pearce all violated the policy's implied covenant of good faith and fair dealing, at substantial cost to AMI.

■ We therefore reject National Union's contention that the jury's verdict in this case was necessarily inconsistent with the holding in *Waller*. This case turns instead on whether the district court was correct that the excess policy covered losses AMI might have incurred defending against Pearce's cross-claim. If so, the jury's finding that AMI suffered no damages as a result of the breach of contract did not preclude its concurrent finding of damages for breach of the implied covenant.

### III. The Coverage Defenses

National Union raised four separate coverage defenses. It need win on only one, however, to prevail on this appeal. Because, as explained below, we find that the "insured-versus-insured" exclusion to the policy barred coverage of Pearce's cross-claim, we reverse without discussing National Union's other defenses.

The "insured-versus-insured" exclusion to the policy barred coverage for any claim "brought against one or more past, present or future directors or officers, by the corporation, its subsidiaries or successors *or by one or more past, present or future directors or officers.*" (Emphasis added.) National Union contends that this exclusion barred coverage of AMI's claim.

Pearce, at the time he filed his cross-claim, was a past director of AMI, while Williams, a defendant, was still on the board. On the surface, therefore, it seems that this exclusion plainly barred coverage of AMI's claim. AMI, however, argues that Pearce was not acting in his *capacity* as a director, either at the time he filed his suit or during the events that gave rise to it. On the contrary, throughout the sale proceedings, Pearce acted as a bidder interested in acquiring the company. He was barred from all board discussions of the sale and instead received information as did any other potential buyer. Consistent with his role in the bidding dispute, Pearce advanced each of the allegations in his complaint related to his spurned attempt to purchase AMI as "an AMI *shareholder,*" or as "a *bidder* seeking to acquire AMI in the auction process." (Emphasis added.) Thus, AMI's contention is certainly correct that, in filing the cross-complaint, Pearce was seeking redress for harm he suffered in his capacity as a bidder and not for harm he suffered in his capacity as a director. The question we must decide is whether the D & O policy distinguishes between Pearce's dual capacities, or was the mere fact that he is a former director enough to bar coverage of his suit?

National Union argues that AMI's dual capacity argument fails as a matter of law. To support this claim, it cites *Montgomery v. Cal Accountants Mutual Insurance Co.*, 61 Cal.App.4th 854, 72 Cal.Rptr.2d 39 (1998), issued after the district court's most recent decision in this case, in which the California Court of Appeal considered whether an "insured-versus-insured" exclusion left room for a dual capacity interpretation. Although it concluded that it did not, the *Montgomery* court reached that decision based on the terms of the specific policy, leaving open the possibility that other contracts might allow dual capacity claims.

The dispute in *Montgomery* arose after an accounting firm (the "Firm") insured by Cal Accountants Mutual Insurance Co. ("Cal Accountants") approached Belfa Kay Montgomery and sought to bring her into the Firm as a partner. The deal eventually soured, however, and in the aftermath, Montgomery filed a lawsuit against the

Firm. The Firm tendered defense of the lawsuit to Cal Accountants. *Id.* at 857, 72 Cal.Rptr.2d 39.

Cal Accountants moved for summary judgement, arguing that the "insured-versus-insured" exclusion in its policy barred coverage for suits against the Firm by one of its partners. Montgomery countered that she was never legally a partner nor even a prospective partner in the Firm and that she was therefore suing in her capacity as an investor. *Id.* at 857–58, 72 Cal. Rptr.2d 39. The court rejected the suggestion that Montgomery was not a partner in the Firm, but then moved on to decide, in the alternative, the validity of her dual capacity argument.

In determining the policy's scope, the court focused on the exclusion clause, which barred coverage for "any Claim or Multiple Claim made in part or whole by *any Insured* or a present, former or prospective ... partner ... of any Insured." *Id.* at 860, 72 Cal.Rptr.2d 39 (emphasis added). Finding that this broad language did not distinguish between Montgomery the partner and Montgomery the investor, and that it instead applied to any *person* insured under the policy, the court held that the exclusion of coverage for suits brought by partners and former partners applied regardless of their claimed capacity. *Id.*

Although we do not read *Montgomery* as barring dual capacity arguments per se, the decision at least provides that under California law we cannot presume a dual capacity interpretation of policy provisions excluding suits by insiders. We must therefore consider the particular language of the contract in detail.

▮ Looking then to the terms of AMI's D & O policy, we conclude that although the language used to limit coverage of suits by insured individuals is different, the intent broadly to preclude suits by those individuals regardless of the capacity in which they sue is no less clear than in *Montgomery.*

We begin by noting that the policy carefully limited coverage to alleged misconduct by directors acting in their official corporate capacity. The insuring clause, for example, extended coverage only to wrongful acts "in [the insureds'] respective *capacities* as directors or officers." (Emphasis added.) The definition of "wrongful act" was limited to alleged misconduct that arose *"solely by reason of their being such directors or officers."* (Emphasis added.) And an endorsement barred coverage for actions related to the insureds' service as a director for any other corporation not named on the policy. Thus, without question, the policy in this case did not cover Williams' actions outside the scope of his directorial capacity.

In contrast, there is no such express "capacity" limitation concerning the other side of the equation. Nothing in the policy specifies that a former director filing a claim, such as Pearce, must also have acted in his capacity as a director in order to trigger the "insured-versus-insured" exclusion. Given the considerable effort to limit coverage for claims against insured individuals to claims concerning actions they took in an official capacity, we find the absence of a similar limitation pertaining to the claiming aspect of the exclusion particularly telling. *Cf. Jablon v. Dean Witter & Co.,* 614 F.2d 677, 681 (9th Cir. 1980) (observing a similar rule applied to statutory interpretations).

More specifically, unlike the insuring clause, the exclusion contains no capacity limitation, either in the clause itself or by reference to any other part of the policy. On the contrary, its extension to both *past* and *future* directors suggests that it is not similarly limited. The reference to "past director" does not really contemplate capacity at all, since a past director has no official role as such. The more natural reading of the term is, therefore, as a description of the person who was formerly a director, an interpretation that, like the interpretation of the broad "any insured" language in *Montgomery,* leads to

the conclusion that the policy did not acknowledge dual capacities for this particular purpose.

The various opinions relied upon by AMI do not persuade us otherwise. The policy reviewed by the Third Circuit in *Township of Center v. First Mercury Syndicate, Inc.,* 117 F.3d 115, 117 (3d Cir. 1997), for example, specifically defined the parties on both sides of the "insured-versus-insured" equation in terms of the "scope of their official duties." The conclusion that a role-based interpretation was intended by that policy was therefore understandable. Moreover, the exclusion in that policy referred generally to claims by an "insured," whereas the language in this case specifically identified claims by *"past* directors" as outside the policy's coverage. Thus, there was no ambiguity here, as there was in *Township of Center,* concerning whether the exclusion applied to suits by individuals who were not insured at the time they filed suit, although they had been earlier. While we do not dispute the rationale that decision put forth in resolving the ambiguous language before the court—that "[t]he primary focus of the ['insured-versus-insured'] exclusion is to prevent collusive suits in which an insured company might seek to force its insurer to pay for the poor business decisions of its officers or managers"—the California approach espoused in *Montgomery* precludes us from reading this intent into the policy where the words of the policy indicate a broader purpose.[2]

The only case AMI cited on this point discussing California law is *Fidelity & Deposit Co. v. Zandstra,* 756 F.Supp. 429 (N.D.Cal.1990). In that case, however, the district court faced a quite different problem, namely whether an "insured-versus-insured" exclusion continues to apply when the underlying suit is brought by the Federal Deposit Insurance Corporation as an assignee of the insured corporation. We therefore find it inapplicable to our analysis.

■ AMI's alternative argument, that Pearce brought his cross-claim as an assignee of other parties, is similarly unavailing. This is a slight modification of AMI's dual capacity argument, but as just explained, the language of the policy simply leaves no room for the role distinctions that AMI seeks to draw. More importantly, however, the claims that remained in Pearce's cross-complaint when AMI asked National Union to make the proceeds of its policy available for settlement were all specific to Pearce and alleged monetary damages that only he incurred. Thus, even if we accept that the policy's "insured-versus-insured" exclusion did not apply to assigned claims, the policy still would not cover the claims for which AMI sought indemnity.

■ In the absence of language qualifying the exclusion to suits brought by present or former directors seeking redress for harm they suffered in their *capacities* as directors, we find that the policy did not extend to Pearce's cross-complaint. Consequently, National Union owed no obligation to AMI and its actions could not have frustrated AMI's attempt to collect benefits. We are thus compelled to conclude that since there was no potential for coverage, the decision in *Waller* bars AMI's claim for breach of the implied covenant of good faith and fair dealing.

### IV. Conclusion

Because the D & O policy in this case did not cover losses from claims filed by a former director, it did not extend to Pearce's cross-claim and AMI cannot maintain its cause of action against National Union for breach of the implied covenant of good faith. We therefore RE-

---

**2.** We note that Pearce's claims arose while he was a director. Whether the exclusion would also apply to any individual who had ever been a director of the company, where the dispute had nothing to do with anything that occurred while he was a director, is a question we need not decide.

VERSE the district court's judgment and set aside the jury's award.